**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE NOV 2 7 2013

*Madsen, C.J.*

CHIEF JUSTICE



This opinion was filed for record
at 8:00 am on 11/27/13

Ronald R. Carpenter
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| INTERNATIONAL MARINE UNDERWRITERS, a division of One Beacon America Insurance Company, a Massachusetts Insurance Company, | No. 87231-7 |
| Respondent, | En Banc |
| v. | Filed  NOV 2 7 2013 |
| ABCD MARINE, LLC, a Washington LLC; ABCD MARINE, a Washington partnership, | |
| Defendants, | |
| and | |
| ALBERT BOOGAARD, an individual domiciled in Washington, | |
| Petitioner, | |
| v. | |
| ALLIANCE INSURANCE CORP., a/k/a ALLIANCE INSURANCE, INC., | |
| Defendant. | |

J.M. JOHNSON, J.—Albert Boogaard argues that the comprehensive marine liability insurance policy he purchased from International Marine Underwriters (IMU) for his general partnership, ABCD Marine, covers the bodily injuries he suffered while working as an independent contractor for Northland Services Inc. (NSI). Specifically, Boogaard claims that even as a general partner he qualifies and is covered as a third party under the "insured contract" provision of the policy. IMU contends that as a general partner and an insured, Boogaard is not a third party under the insured contract provision, so there is no coverage.

We affirm summary judgment in favor of IMU. As a general partner, Boogaard does not qualify as a third party under the "insured contract" provision in accordance with Washington partnership law.

FACTS AND PROCEDURAL HISTORY

At the time pertinent to this case, Boogaard was one of two partners in ABCD, a Washington general partnership. Boogaard formed ABCD by oral agreement with Wes Dahl in 2000 for the purpose of providing marine welding services. Boogaard and Dahl were both welders and did the majority of their work as independent contractors for the Northland family of companies at Terminal 115 on the Duwamish River in Seattle. Boogaard

was the senior partner and took the responsibility on himself to secure insurance and handle all of the partnership's other administrative paperwork.

In August 2001, the supervisor for barge maintenance and repair at Terminal 115 sent the contractors working at the terminal a letter in which he informed them that they would need to provide proof of general liability coverage in the amount of $1,000,000 in order to continue to work at the terminal. Clerk's Papers (CP) at 328. The required proof was a certificate of insurance that in addition to stating the coverage details, had to name and expressly add Naknek Barge Lines LLC (Naknek) and Northland Holdings Inc. (Northland) as additional insureds. *Id.* In order to comply with this requirement, Boogaard turned to ABCD's insurance broker, Alliance Insurance Corporation. Boogaard took the supervisor's letter directly to Alliance and requested insurance that complied with its requirements. Alliance purchased a policy on ABCD's behalf and issued a certificate reflecting aggregate coverage of $1,000,000 and Naknek and Northland as additional insureds. CP at 330. Alliance issued a similar certificate for the 2002-2003 policy period.[1] CP at 332. No endorsements securing Naknek and Northland's status as additional insureds were ever issued. The policy

---

[1] From the record it does not appear that any certificates were issued for the 2003-2004 or 2004-2005 policy periods.

3

included an exclusion for contractually assumed liability but had an exception to that exclusion for "insured contracts": contracts in which the insured "assume[s] the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization." CP at 136.

In September 2004, after Naknek was acquired by a Northland entity, the terminal supervisor informed the contractors that they would need to sign a new agreement (Access Agreement) with NSI in order to continue work at Terminal 115. The Access Agreement required ABCD to indemnify NSI for "all bodily and personal injuries to all persons arising out of or resulting from its operations and/or use of the [NSI] [p]roperty, including bodily and personal injuries to its own employees, except if caused by the sole intentional negligence of NSI." CP at 275. The Access Agreement also required ABCD to maintain a general liability policy for $1,000,000 that included an additional insured endorsement naming NSI as an additional insured. *Id.*

On September 29, 2004, Boogaard was presented with the Access Agreement. CP at 179-80, 274. Boogaard gave it a five-minute review and then personally filled it out and signed it in his capacity as "Senior Partner." *Id.* Boogaard did not know what an "additional insured" was and thought

4

the insurance he had in place at the time was sufficient. CP at 183. Boogaard did not contact his broker, Alliance, to see if he had to modify his insurance in any way to comply with the requirements detailed in the Access Agreement. *Id.* Boogaard did not take the Access Agreement to a lawyer or anyone else to see if it required additional insurance.[2] CP at 184.

In October 2004, Boogaard was seriously injured while on the job at Terminal 115 by an NSI employee operating a forklift.[3,4] As a result of his injuries, Boogaard incurred approximately $92,000 in medical bills, suffered permanent injuries, and was out of work for approximately one year.

In November 2004, Boogaard and Dahl converted ABCD into a limited liability company (LLC). As a result of the accident, Boogaard realized that as a general partnership he and Dahl were exposed to what he deemed to be an unacceptable amount of personal liability. CP at 170.

In December 2004, acting on behalf of ABCD LLC, Alliance contacted IMU and asked that IMU change ABCD's policy to reflect its new

---

[2] Boogaard did not inform IMU that he had signed the Access Agreement until after his accident. CP at 75.

[3] There is some confusion in the record as to the exact date of Boogaard's accident. The exact date is ultimately immaterial as it is not in dispute that the injury took place in October 2004 and consequently, within the 2004-2005 policy period.

[4] At the time of the accident, ABCD was doing contract work for NSI, a Northland entity.

LLC status, issue a certificate of insurance naming NSI as an additional insured, and issue additional insured and waiver of subrogation endorsements. For an additional $250 premium, IMU changed the policy and issued the endorsements as requested effective prospectively starting December 1, 2004. Alliance issued the accompanying certificate on December 10, 2004.

In November 2006, Boogaard filed a lawsuit in King County Superior Court against NSI and the forklift operator. NSI answered and counterclaimed alleging, among other things, breach of the Access Agreement. In March 2007, Boogaard tendered defense of the counterclaims to IMU. IMU accepted the tender under a reservation of rights and appointed additional counsel to work with Boogaard's primary counsel to defend against NSI's counterclaims. In March 2008, the trial court granted NSI summary judgment, ordering Boogaard to indemnify NSI pursuant to the Access Agreement for any amounts he may recover against NSI in the action, including attorney fees and costs. The trial court also found that Boogaard breached the Access Agreement by failing to procure insurance covering NSI.

After the trial court issued the summary judgment order, Boogaard's primary counsel asked IMU if it would be willing to continue to prosecute the appeal of the summary judgment order and if IMU would be covering any of the damages the court awarded NSI. IMU responded by letter on March 20, 2008, that it would continue to provide counsel for an appeal but that it would not agree to cover the damages the court awarded NSI, as IMU had determined that the policy did not cover NSI.

On April 10, 2008, during mediation, NSI and Boogaard reached a settlement agreement in which Boogaard was awarded $600,000 and NSI was awarded $712,022.01 (indemnification for the amount of damages awarded to Boogaard and NSI's attorney fees and costs). CP at 595-96, 740-743. NSI also agreed to pay Boogaard an additional $50,000 in partial satisfaction of the $600,000 judgment against NSI. CP at 596, 743. Boogaard agreed not to execute or enforce his judgment against NSI and to only seek recovery from IMU. CP at 742. The parties further agreed that resolution of the insurance claims, regardless of the outcome of that litigation, would be deemed as satisfaction of the judgments each party had against the other. *Id.*

On April 28, 2008, IMU filed a complaint for declaratory relief, seeking a judicial determination that there is no coverage under the IMU policy for the NSI counterclaims. In his answer and counterclaim, Boogaard argued that IMU's denial was in bad faith, that there was coverage under the policy for the counterclaims, or in the alternative, that IMU should be estopped from denying coverage and that Boogaard should be awarded treble damages and attorney fees.[5]

In August 2008, the trial court determined that the settlement between Boogaard and NSI was reasonable. In its reasonableness order, the court specifically found the settlement reasonable as to IMU because not only was IMU involved in the defense of the counterclaims, it was also a party to the mediation where the settlement was negotiated and was given both a notice of the reasonableness hearing and an opportunity to participate.[6]

---

[5] Boogaard was also allowed to assert a third party claim for professional negligence against his insurance broker, Alliance. The trial court granted Alliance's motion for summary judgment and dismissed Boogaard's claims against it with prejudice. At the Court of Appeals, Boogaard settled with Alliance and dropped his appeal of the trial court's order granting Alliance summary judgment. Consequently, Boogaard's claims against Alliance are not before us.

[6] Importantly, NSI moved the trial court in the declaratory action between IMU and Boogaard for an order dismissing IMU's claims against it as NSI had assigned any right of recovery it may have had against IMU to Boogaard. IMU and NSI later stipulated that the claims between them had been fully resolved and the trial court ordered the claims against NSI dismissed with prejudice and without attorney fees and costs.

In November 2009, IMU moved for partial summary judgment in the declaratory action, asking the court to determine that as a matter of law the IMU comprehensive marine liability policy does not cover the damages resulting from the NSI counterclaims. IMU argued that the policy was intended to cover ABCD and Boogaard's liability to others for the partners' negligence. IMU argues that this intent is manifested by the policy's listing ABCD Marine as the "named insured" and Boogaard as an "insured." CP at 110, 125. IMU acknowledged that there was an "insured contract" exception that would cover the torts of others which cause damage to "third persons or organizations." *Id.* IMU argued, however, that Boogaard does not qualify as a "third person," under the terms of the policy.[7]

In January 2010, the trial court granted IMU's motion for partial summary judgment, ruling that as a matter of law, the damages arising out of the forklift incident are not covered by the IMU policy. The trial court subsequently denied Boogaard's motion for reconsideration.[8]

---

[7] The insurance policy in its entirety can be found at pages 110-145 of the Clerk's Papers.

[8] In April 2010, the trial court denied IMU's motion for partial summary judgment, declining to dismiss ABCD and Boogaard's bad faith counterclaims. In September 2010, the trial court dismissed all remaining claims, including those for bad faith, without prejudice and without costs pursuant to a stipulation by the parties.

Boogaard and ABCD appealed the trial court's summary judgment order and the Court of Appeals affirmed the trial court in a 3-0 decision, holding that Boogaard is not a "third person." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 165 Wn. App. 223, 232, 267 P.3d 479 (2011). Boogaard and ABCD petitioned for discretionary review, which was granted.

## STANDARD OF REVIEW

We review summary judgment decisions de novo, engaging in the same inquiry as the trial court. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hubbard v. Spokane County*, 146 Wn.2d 699, 707, 50 P.3d 602 (2002); CR 56(c).

## ANALYSIS

A. Interpretation and Construction

Interpretation and construction are separate endeavors. When interpreting a contract a court is "'giv[ing] meaning to the symbols of expression used by another person.'" *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990) (quoting 3 ARTHUR LINTON CORBIN, CORBIN ON

CONTRACTS § 532, at 2 (1960)). In contrast, when construing a contract a court is engaging in the "'process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation.'" *Id.* (quoting Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 COLUM. L. REV. 833, 835 (1964)).

### 1. Interpretation

During interpretation, a court's primary goal is to ascertain the parties' intent at the time they executed the contract. *Berg*, 115 Wn.2d at 663. "[E]xtrinsic evidence is admissible as . . . an aid in ascertaining the parties' intent." *Id.* at 667. The court, however, must distinguish the parties' intent at the time of formation from the interpretations the parties are advocating at the time of the litigation. *Id.* at 669 (explaining that extrinsic evidence should not be used to import into a contract an intent that is not expressed in the contract itself). Contract interpretation is a matter of law. *Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County*, 112 Wn.2d 1, 10, 771 P.2d 701 (1989).

When interpreting insurance contracts, courts use the same interpretive techniques employed on other commercial contracts.[9] *McDonald Indus., Inc. v. Rollins Leasing Corp.*, 95 Wn.2d 909, 912 n.2, 631 P.2d 947 (1981). For example, a court may look to the structure of the policy as "an important objective source of meaning and intent." *Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 377, 917 P.2d 116 (1996). A court will also consider whether there was another type of insurance that would have covered the loss. *See Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 123 Wn.2d 678, 688, 871 P.2d 146 (1994) (explaining that courts consider the availability of an alternative and/or more specific endorsement to be "highly significant"). It is possible, however, that there may be no extrinsic evidence to review when an insurer issues a standard policy. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 82, 882 P.2d 703, 891 P.2d 718 (1994) (recognizing that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds).

---

[9] Washington courts have never attempted to formulate a definitive list of aids to interpretation, but there are 10 maxims that are commonly used. *See Berg*, 115 Wn.2d at 665; THOMAS V. HARRIS, WASHINGTON INSURANCE LAW §§ 6.10-6.12 (3d ed. 2010) (containing a complete list adapted to insurance contracts).

If during interpretation a court has determined that an essential provision is ambiguous (susceptible to two different reasonable interpretations), the court must attempt to resolve that ambiguity. *Boeing Airplane Co. v. Firemen's Fund Ins. Indem. Co.*, 44 Wn.2d 488, 496, 268 P.2d 654 (1954), *overruled on other grounds by Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990); *see Farmers Ins. Co. of Wash. v. Grelis*, 43 Wn. App. 475, 477, 718 P.2d 812 (1986) (recognizing that determining whether a policy is ambiguous is a matter of law). "Apparent" ambiguities can sometimes be resolved by reading the policy as a whole. *Queen City Farms*, 126 Wn.2d at 74; *see also Boeing*, 44 Wn.2d at 496 ("[I]t is the duty of the court to search out the intent of the parties by viewing the contract as a whole and considering all of the circumstances surrounding the transaction."); *Kent Farms, Inc. v. Zurich Ins. Co.*, 140 Wn.2d 396, 400, 998 P.2d 292 (2000) (explaining that courts will interpret policy exclusions in the context of the whole policy). A court, however, may not interpret a policy in such a way that it creates nonexistent ambiguities that result in the policy being construed in favor of the insured. *See, e.g., West Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 80 Wn.2d 38, 44, 491 P.2d 641 (1971); *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 734, 837 P.2d

1000 (1992) (recognizing that just because the policy language is complicated or confusing does not mean the provision in question is ambiguous).

In addition, if there are any undefined terms they will be given their "plain, ordinary, and popular meaning . . . ." *Queen City Farms*, 126 Wn.2d at 66; *see also Lynott*, 123 Wn.2d at 691 (holding that undefined exclusionary terms are given their plain, ordinary, and popular meaning). To determine the plain meaning of an undefined term, courts often refer to standard English dictionaries. *Queen City Farms*, 126 Wn.2d at 77 (referring specifically to *Webster's Third New International Dictionary* (1981)); *see Spratt v. Crusader Ins. Co.*, 109 Wn. App. 944, 949-50, 37 P.3d 1269 (2002) (holding that an expert's affidavit could not be a stand-in for a dictionary definition because it is the role of the court to determine how the average person would understand the policy). If a standard dictionary is not clear, we can look to the common law or specialty insurance and legal dictionaries. *See Lynott*, 123 Wn.2d at 691-92. Consequently, the fact that a term is undefined does not automatically render a provision ambiguous.

Boogaard claims that the parties always intended for the policy to cover his injuries. Boogaard argues this is because it was the partnership

14

that signed the Access Agreement, not the partners in their individual capacity, so he is a third party as to NSI and clearly within the scope of the "insured contract" exception. In response, IMU claims that it was clear from the start that the intent of this comprehensive marine liability insurance policy was to protect ABCD, Boogaard, and Dahl from any liability that might result if the partners/partnership injured another party. IMU argues that nowhere in the policy, or the parties' interaction leading up to execution, did either party express an expectation or desire that the policy cover damages stemming from personal injury to the partners themselves.

As explained above, we must look past these present claims of intent in our attempt to ascertain the parties' intent at the time of execution. This was a standard industry policy, so there was not any negotiation before execution. Boogaard, however, did express his purpose for obtaining the insurance when he presented Alliance with the 2001 terminal supervisor's letter that spelled out Northland and Naknek's new insurance requirements for its contractors. According to his deposition testimony, Boogaard presented the terminal supervisor's letter to his broker at Alliance and told

her to "[t]ake care of it" so he could get back to work.[10] CP at 184. The letter required all contractors to obtain $1,000,000 in general liability coverage and provide a certificate of insurance to the terminal supervisor that, among other things, named and waived Naknek and Northland. CP at 328.

Thus, Boogaard intended to obtain the coverage spelled out in the terminal supervisor's letter. The letter shows it was possible that his "intent" was to cover his own personal injuries to the extent that he was injured by an employee of Naknek or Northland, as these entities should have been additional insureds on his policy.[11] Boogaard, however, did not present the Access Agreement to Alliance either before or after he signed it. Consequently, his intent when renewing the policy for the relevant 2004-2005 term matches his intent at the time he initially acquired the insurance. Thus, he likely did not intend to be covered for his own personal injuries if he was injured by an employee of NSI. Otherwise, Boogaard made no other expression to show it was his intent that he be covered as if the policy were

---

[10] It is unclear whether Boogaard knew exactly what type of insurance he was purchasing or why Northland and Naknek were requiring that he purchase it.

[11] It is undisputed that if NSI had been an additional insured under the IMU policy for the 2004-2005 policy period, like it was contractually supposed to be, Boogaard's damages would have been covered.

16

for health and/or disability insurance. Our inquiry into intent, however, should not end there. Next, we should look at the policy as a whole.

The numerous exclusions relating to liability for injuries to employees or the insureds themselves make it clear that the predominant purpose of this policy was to cover the insured's liability to other entities/persons. The policy covers the insured for (1) bodily injury/property damage liability the insured becomes legally obligated to pay, (2) personal and advertising injury liability the insured becomes legally obligated to pay, and (3) certain medical payments the insured might have to pay. CP at 112-13. Among other exclusions, the policy does not cover the insured for (1) liability as an employer or in any other capacity to its employees; (2) liability to the spouse, child, dependent, etc., of any of its employees arising out of bodily/personal injury to that employee; (3) liability to any other party arising out of bodily/personal injury to any employees, including for indemnity or contribution in tort or contract and any liability of other parties assumed under contract; (4) liability of any employee with respect to bodily/personal injury to another employee; (5) any liability directors, officer, partners, principals, employees or stockholders may have to any employee; (6) any medical expenses for any insured, person hired to do

work for any insured, or any tenant of any insured if the benefits for the bodily injury are payable or must be provided under workers' compensation or disability benefits law or other similar law; or (7) for liability an employee incurs for inflicting bodily/personal injury on the insured or its partners or members. CP at 114-25. Given the exclusions, if an average person were to review this policy, it is unlikely they would conclude that it was intended to cover an insured or an insured's employee for their own personal injuries or disabilities.[12]

Significantly, Boogaard and Dahl were aware of other types of insurance that clearly would have covered their work-related personal injuries. CP at 157-58. The fact that Boogaard and Dahl did not purchase labor & industries, longshoreman, or harbor workers' insurance would strengthen the argument that Boogaard thought his personal injuries were covered by the IMU policy if it were not for the fact that Boogaard said the principal reason they did not acquire those policies was that they were told they did not need them in order to work at the terminal. *Id.* Boogaard's decision to not buy workers' compensation insurance had more to do with

---

[12] It is significant that IMU required ABCD to pay an additional premium to place NSI on the policy as an additional insured. By making NSI an additional insured, injuries like Boogaard's would now be covered, exposing the insurer to additional risk.

the fact that he thought it was not a prerequisite to working at the terminal and not because he thought the IMU policy covered him.[13, 14]

Finally, we must consider the fact that "third party" is not defined in the insured contract exception or anywhere else in the policy. The ultimate issue we are to decide is whether or not Boogaard qualifies as a third party under the "insured contract" exception. We give undefined terms their plain, ordinary, and popular meaning. *Queen City Farms*, 126 Wn.2d at 66. A standard English dictionary defines "third party" as "[A] person other than the principals." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2378 (2002). There is no indication IMU or ABCD/Boogaard intended any other definition for "third party." Thus, a person/entity is a third party as the term is used in the "insured contract" exception if he/she/it is not a principal/party to the indemnity agreement (Access Agreement). There is no ambiguity here.

---

[13] The Access Agreement required ABCD to obtain such insurance. CP at 275. ABCD failed to do so. CP at 157. In fact, after the accident, Dahl went out and obtained L&I insurance in order to comply with the requirement. CP at 158.

[14] In his deposition testimony, Boogaard claims he thought he was covered because he looked at the policy, saw the $1,000,000 figure, and assumed that that would cover him. CP at 158. He further stated that he thought he had workers' compensation insurance through the policy. *Id.* The policy has no provision providing for workers' compensation coverage or anything even resembling it. An insured has an affirmative duty to read his or her policy and to know its terms and conditions. *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 257, 928 P.2d 1127 (1996).

## 2. Construction

After interpreting an insurance policy, the court must construe it, i.e., determine its legal effect. *See Berg*, 115 Wn.2d at 663. If a court is unable to resolve an ambiguity through interpretation, it must construe the ambiguity in favor of the insured. *Queen City Farms*, 126 Wn.2d at 68; *see also George v. Farmer Ins. Co. of Wash.*, 106 Wn. App. 430, 439, 23 P.3d 552 (2001) ("Exclusionary clauses are narrowly construed for the purpose of providing maximum coverage for the insured."). Consequently, if insurers want exclusions upheld, they have the burden of drafting them in "clear" and "unequivocal" terms.[15] *Am. Star Ins. Co. v. Grice*, 121 Wn.2d 869, 875, 854 P.2d 622 (1993), *supplemented by* 123 Wn.2d 131, 865 P.2d 507 (1994). A court, however, is not at liberty to revise a contract under the theory of construing it. *Evans v. Metro. Life Ins. Co.*, 26 Wn.2d 594, 604, 174 P.2d 961 (1946). Here, it is clear that the parties intended "third party" to mean those persons or entities that are not principals/parties to the Access

---

[15] We will uphold exclusions that rationally limit the risks of the insurer. *Kelly v. Aetna Cas. & Sur. Co.*, 100 Wn.2d 401, 408, 670 P.2d 267 (1983) ("'An insurer is free to limit its risks by excluding coverage when the nature of its risk is altered by factors not contemplated by it in computing premiums . . . .'" (quoting *Mutual of Enumclaw Ins. Co. v. Wiscomb*, 97 Wn.2d 203, 209, 643 P.2d 441 (1982))). "Many insureds must purchase several different coverages to protect their financial interests . . . [and] cannot sell or purchase dovetailed coverages unless insurable risks that are included within one coverage can be cleanly and predictably excluded from another coverage." THOMAS V. HARRIS, WASHINGTON INSURANCE LAW § 6.10, at 6-34 (3d ed. 2010).

Agreement. Accordingly, we must interpret our partnership law to decide if

Boogaard, as a partner in a general partnership, was a principal/party to the

Access Agreement.[16]

B.    Revised Uniform Partnership Act and General Partnerships

A "partnership" is an "association of two or more persons to carry on

as co-owners a business for profit . . . ." RCW 25.05.005(6). The legislature

enacted the Revised Uniform Partnership Act (RUPA) in 1998 to replace the

Uniform Partnership Act (UPA), the law governing partnerships in this state

since 1945. LAWS OF 1998, ch. 103 (RUPA); LAWS OF 1945, ch. 137 (UPA).

The RUPA differs from the UPA in a number of respects.

Most importantly for this case, the RUPA places an "'increased

emphasis on the entity theory [of partnerships] as the dominant model.'"

ROBERT W. HILLMAN ET AL., THE REVISED UNIFORM PARTNERSHIP ACT

SECTION 201, at 1 (Westlaw Sept. 2012) (quoting UNIF. P'SHIP ACT § 201

cmt., 6 U.L.A. 91 (1997)). RCW 25.05.050 (section 201(a)) states that "[a]

---

[16] Boogaard could be a first party to the insurance contract as an "insured" and still be a "third party" under the "insured contract" exception to the relationship between ABCD and NSI if our partnership law allowed that result. *See* discussion *infra* Part B. The policy defines "you" and "your" as the named insured on the declaration page. CP at 112. The named insured is ABCD. CP at 110. The policy also defines an "insured," which is what Boogaard is, as a partner. CP at 112. Thus, the "you" referred to in the definition of "insured contract" is ABCD, not Boogaard.

21

partnership is an entity distinct from its partners." The entity theory is one of the two main theories governing the law's treatment of partnerships. The other, aggregate theory, was traditionally applied in the common law and posits that partnerships are "nothing more than a conduit for a collection of individuals." HILLMAN ET AL., *supra*, author's cmt. 1. Under the aggregate theory, the partnership is not a separate legal personality. *Id.* The partners own an undivided share of partnership assets and conduct a pro rata share of partnership business. *Id.* In contrast, under the entity theory, the partnership is "a distinct entity interposed between partners and the partnership assets." *Id.* Each partner's interest is a "separate bundle of rights and liabilities associated with the partner's participation in the organization, analogous to the interest of a corporate shareholder in shares of stock." *Id.* "[T]he U.P.A. adopted an entity theory for some purposes, [but] the aggregate theory predominated." *Id.* The reverse is true for the RUPA. *Id.*

The RUPA's emphasis on the entity theory was intended to resolve some of the issues stemming from the aggregate theory. *Id.* For example, under the UPA if someone was added to or withdrew from a partnership, any title had to be conveyed by deed from the "'old'" partnership to the "'new'" partnership. *Id.* (quoting UNIF. P'SHIP ACT § 201 cmt., 6 U.L.A. 91). Under

the RUPA, there is not necessarily a "'new'" partnership just because the membership changes. [17, 18]

In sum, the RUPA adopted the entity theory as the dominant model "for three basic reasons: (1) to add theoretical stability to partnerships that have contracted for stability; (2) to reflect the extent to which partnerships are treated as entities in the world of commerce; and (3) to add simplicity of analysis." *Id.* author's cmt. 2. The RUPA, however, did not do away with the aggregate theory. *Id.* To the contrary, the official comment makes it clear that the change is one of emphasis only. *Id.* The RUPA continues to use the aggregate approach for some purposes. *Id.*

Of special significance to this case, the aggregate theory continues to govern the personal liability of partners.[19] *Id.; see also Gildon v. Simon*

---

[17] In other words, under RCW 25.05.200 (section 501), the partner's only transferable interest is his or her share of the profits and losses and his or her right to receive distributions.

[18] The partners would have had to have expressed their intent that the partnership continue after a change in membership. HILLMAN ET AL., *supra*, author's cmt. 1. Other examples of how RUPA's emphasis on the entity theory has changed partnership law include the fact that RUPA enables a partnership to sue and be sued in the name of the partnership and the fact that partners who embezzle from the partnership are now subject to the same criminal penalties as shareholders who embezzle from corporations. *Id.* author's cmt. 5; *see* RCW 25.05.130 (section 307(a)).

[19] Fiduciary duties for partners also reflect the aggregate approach. RCW 25.05.165 (section 404(a)) states that a partner owes fiduciary duties "to the partnership and the other partners." In another example, federal courts treat the citizenship of a partnership as being composed of the citizenship of each individual partner when determining

*Prop. Grp., Inc.*, 158 Wn.2d 483, 500, 145 P.3d 1196 (2006) (noting that the RUPA did not fundamentally alter the nature of liability for partners and partnerships). RCW 25.05.125 (section 306) holds partners jointly and severally liable for all of the partnership's obligations. Under RCW 25.05.120 (section 305), a partnership is liable for injury or loss caused as the result "of a partner acting in the ordinary course of the partnership business . . . ." This is because, under RCW 25.05.100 (section 301), "[e]ach partner is an agent of the partnership for the purpose of its business" so when a partner acts to "carry[] on in the ordinary course [of] the partnership business . . . [he or she] binds the partnership . . . ." *See also* RCW 25.05.150(6) (section 401(f)) ("Each partner has equal rights in the management and conduct of the partnership business."). Consequently, a single partner, acting in the ordinary business of the partnership, binds the entire partnership and subjects each partner to personal liability, joint and several, for the obligation incurred. While free to modify many of RUPA's provisions by agreement, partnerships are not permitted to modify their joint and several liability to third persons. RCW 25.05.015(2)(j) (section 103(b)(10)); *see also Gildon*, 158 Wn.2d at 500. This result is in stark

---

diversity for jurisdiction. *E.g., Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 895, 899 (9th Cir. 2006).

contrast to the effect an executive's action has on the liability of the shareholders in a corporation or a manager's action has on the liability of an LLC's members. With a corporation or an LLC there is typically no personal liability beyond the individual shareholder or member's stake in the entity.

Clearly, our law does not treat ABCD as a distinct entity when it is time for the obligations it incurred under the Access Agreement to be honored. RUPA, through its adoption of the aggregate theory for liability, holds Boogaard and Dahl personally liable. In essence, when ABCD said that it agreed to indemnify NSI, then Boogaard simultaneously and automatically agreed to do the same thing.[20] The liability of the partnership is the liability of the partners and the liability of a partner incurred in the course of partnership business is the liability of the partnership. Each partner is an agent of the partnership, binding and bound by the partnership. RCW 25.05.100(1), .125(1). That is the role the partner accepts upon joining a partnership. Consequently, both ABCD and Boogaard were parties to the Access Agreement.

---

[20] It is true that RUPA usually requires a creditor to first exhaust the partnership's assets before pursuing the partners' personal assets and that it imposes other specific requirements relating to judgment execution, but that does not change the fact that a partner is personally liable. *See* RCW 25.05.130(4) (section 307).

Boogaard brings various cases to our attention in his attempt to avoid the conclusion that RUPA does not treat a general partnership as a distinct entity when determining liability. First, Boogaard points us to *Cowan Systems, Inc. v. Harleysville Mutual Insurance Co.*, 457 F.3d 368 (4th Cir. 2006). In *Cowan*, Linens N' Things contracted with Cowan, a corporation, to provide transportation services. *Id.* at 371. As part of the contract, Cowan agreed to indemnify Linens N' Things for any liability arising out of its operations. *Id.* Subsequently, one of Cowan's employees, Shaffer, slipped and fell on ice in a Linen N' Things storage lot. *Id.* at 370-71. Cowan's insurance policy, like Boogaard's, was for commercial general liability and contained a similar exclusion for contractually assumed liability with an "insured contract" exception identical to the one in the IMU policy. *Id.* at 372. The court determined that Shaffer was a third party, as the term was used in the "insured contract" exception, because he was not a party to the Linens N' Things and Cowan contract. *Id.* at 373. *Cowan* is inapposite here. Unlike a partner in a general partnership, an employee of a corporation cannot bind a corporation and does not assume any liability on its behalf.[21]

---

[21] Boogaard also directs us to *XL Specialty Insurance Co. v. Kiewit Offshore Services Ltd.*, 336 F. Supp. 2d 673 (S.D. Texas 2004), *aff'd*, 513 F.3d 146 (5th Cir. 2008); *Marlin v. Wetzel County Board of Education*, 212 W. Va. 215, 569 S.E.2d 462 (2002); and *Hunt*

Partnerships and corporations are fundamentally different entities in the eyes of the law.

Next, Boogaard argues that *Truck Insurance Exchange v. BRE Properties, Inc.*, 119 Wn. App. 582, 81 P.3d 929 (2003) is strong persuasive authority in his favor. In *Truck*, West Star Construction, a corporation, contracted with BRE Properties, also a corporation, to work as a subcontractor on an apartment project. *Id.* at 584. In the contract, West Star agreed to indemnify BRE against certain risks and to obtain a comprehensive general liability policy that would cover both itself and BRE. *Id.* at 584-85. West Star obtained a policy that had an "insured contract" provision identical to the provision in the IMU policy. *Id.* at 587. West Star made sure BRE was listed as an "additional insured." *Id.* at 589. Later, a West Star employee injured by the negligence of a BRE employee sued BRE. *Id.* at 585. BRE requested coverage from West Star's insurer and brought a contribution claim against West Star. *Id.* The insurer filed a declaratory judgment action arguing it did not owe coverage to either party. *Id.* The court determined that as an "additional insured" BRE was entitled to

---

*v. Ciminelli-Cowper Co.*, 93 A.D.3d 1152, 939 N.Y.S.2d 781 (2012), which are almost factually identical to *Cowan* in that they involve an indemnification agreement and insurance policy with an "insured contract" exception. These cases are inapposite, however, for exactly the same reason as *Cowan*; they involve employees of corporations.

coverage under the policy and that the indemnification agreement qualified as an "insured contract," so Truck must provide coverage for any indemnification West Star owed BRE. *Id.* at 592, 595-96.

*Truck*, however, does not resolve the issue before us. In *Truck*, it was again an employee of a corporation, not a partner in a general partnership, filing suit. Moreover, unlike ABCD, West Star complied with its contract by making sure BRE was an "additional insured." The parties agree that if NSI had been listed as an "additional insured" on the policy, there would have been coverage. Furthermore, unlike the insurer in *Truck*, IMU concedes that the Access Agreement is an "insured contract." *Truck* does nothing to alter our partnership law and is factually distinct from the present case.

Finally, Boogaard argues that we must deem him a third party because to do otherwise would fly in the face of our decision in *McDowell v. Austin Co.*, 105 Wn.2d 48, 710 P.2d 192 (1985). In *McDowell*, we upheld a contract that required indemnification of the indemnitee against losses caused by its own negligence when the indemnitor was also negligent. *Id.* at 54-55. We said our decision to uphold the contract was consistent with RCW 4.24.115, which prohibits agreements requiring indemnification for

28

the sole negligence of the indemnitee. *Id.* It is unclear, however, why *McDowell* is relevant here. The argument that the Access Agreement violated RCW 4.24.115 and *McDowell* and is therefore unenforceable would have been relevant in the underlying action between ABCD, Boogaard, and NSI, not in this declaratory action involving insurance coverage.

Boogaard contends that ruling in IMU's favor would leave contract workers and small general contractors without a remedy for their jobsite injuries. Boogaard also alleges that such a ruling would allow insurers to get out of providing indemnity coverage under "insured contracts" provisions in the policies they issue. Boogaard overstates the impact of a ruling against him by glossing over the fact that his is a unique situation of his own making.

First, if Boogaard had honored the contract he had signed with NSI and made NSI an additional insured, there would be coverage for his injuries. Most indemnification agreements of the type signed here require the indemnitor to also acquire comprehensive general liability insurance and place the indemnitee on the policy as an additional insured. Boogaard's own insurance expert acknowledged this fact. *See* CP at 413 (Decl. Sedillo ¶ 7) ("[I]t is common to require that the indemnitee be included as an additional

insured on the indemnitor's liability insurance."). Second, Boogaard consciously decided not to purchase workers' compensation or other similar insurance, undoubtedly in an effort to keep his costs down. Third, as the dearth of case law involving "insured contracts" and partnerships shows, most of the time corporations are involved and employees of corporations are generally not parties to indemnification agreements.

In sum, our partnership law is not interacting with our law regarding indemnification and insurance contracts to create a pit for contract workers and small general contractors. If partnerships like ABCD honor their contracts and/or obtain first-party insurance for their partners, they will be covered for these types of injuries.

If we hold that Boogaard was not a party to the Access Agreement, in essence treating ABCD as if it were a corporation or an LLC, we would contradict the RUPA and further confuse our state's law governing business organizations. A general partnership is assumed as the default business organization. We require individuals interested in forming limited liability entities to register with the state as such and comply with additional requirements in part to provide fair warning to others with whom they interact. Corporations and partnerships have different corporate structures,

rules and liabilities that warrant different treatment. Boogaard signed the Access Agreement and in doing so bound both him and the partnership.

## CONCLUSION

The IMU policy was never intended to cover Boogaard's personal injuries. Moreover, Washington's partnership law, the RUPA, clearly treats a general partnership as an aggregation of its partners for purposes of determining liability. Consequently, when Boogaard signed the Access Agreement he was binding both himself and the partnership and cannot be considered a "third party" to that agreement. We affirm summary judgment in favor of IMU because, as a matter of law, Boogaard does not qualify as a third party under the "insured contract" exception in the IMU comprehensive marine liability insurance policy. Accordingly, Boogaard's request for attorney fees pursuant to *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991) and RCW 48.30.015 is denied.

No. 87231-7

WE CONCUR:

Madsen, C.J.

Owens, J.

32

No. 87231-7

WIGGINS, J. (concurring)—I agree with the result the lead opinion reaches but would resolve this case much more simply. We must answer a straightforward question: was Albert Boogaard a "third person" to the indemnification agreement he signed as a general partner of ABCD Marine, as the term "third person" is used in ABCD's insurance policy with International Marine Underwriters (IMU)?

IMU issued an insurance policy covering ABCD and its partners for liability arising out of bodily injury and property damage. The policy expressly excluded from coverage bodily injury or property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." Clerk's Papers at 114. However, the policy excepted from this exclusion any liability assumed in an "'insured contract,'" *id.*, which the policy defined as "[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization," *id.* at 136. The agreement Boogaard signed with Northland Services, Inc. (NSI) indemnified NSI for "all bodily and personal injuries to all persons arising out of or resulting from [ABCD's] operations and/or use of the [p]roperty . . . ." *Id.* at 275. Thus, the indemnification agreement between ABCD and NSI was clearly a contract or agreement that pertained to ABCD's business. The

only unresolved issue is whether the ABCD-NSI agreement assumed tort liability to pay for injury to a third person, that is, was Boogaard, the injured party seeking redress in tort, a third person to the ABCD-NSI indemnification agreement?

Unlike the lead opinion, I believe that *Cowan Systems, Inc. v. Harleysville Mutual Insurance Co.*, 457 F.3d 368 (4th Cir. 2006), is instructive in determining the identity of a third party to an indemnification agreement. The importance of *Cowan* is not that it involved an employee of a corporation rather than a partner of a general partnership, *see* lead opinion at 26-27, but that for the purposes of interpreting an insured contract clause, courts should look to whether the injured person is a third person as to the indemnified party. *Cowan*, 457 F.3d at 373 ("Because Cowan was assuming Linens N Things' tort liability to Shaffer and because Shaffer was a 'third person' *with respect to Linens N Things*, the conditions of contractual coverage were satisfied." (emphasis added)). Thus, following *Cowan*'s lead, the question that resolves this case is whether Boogaard, the injured party, was a third person as to NSI, the indemnified party.

This question is easily resolved in the negative. When ABCD entered into an indemnity agreement with NSI, ABCD undertook an obligation to hold NSI harmless for all injuries and property damage resulting from ABCD's operations on NSI's property. Because "all partners are liable jointly and severally for all obligations of the partnership," RCW 25.05.125(1), ABCD's indemnification obligation was also Boogaard's. Boogaard was therefore not a third party as to NSI.

2

Because Boogaard did not qualify as a third person, the indemnification agreement between ABCD and NSI was not an insured contract. Thus, the coverage exclusion applies to Boogaard's injury and IMU owes ABCD no coverage.

Because the lead opinion unnecessarily complicates the issues presented by this case, I join its opinion only insofar as it is consistent with the foregoing analysis.

I concur.

Wiggins, J.

Fairhurst, J.

*Int'l Marine Underwriters v. ABCD Marine, LLC*
Dissent by C. Johnson, J.

No. 87231-7

C. JOHNSON, J. (dissenting)—Both the lead opinion and concurrence misunderstand the nature of the partnership and the effect that a general partner's joint and several liability has in relationship to agreements entered into on behalf of the partnership. Because both opinions ignore clear statutory guidance on the relationship of partners vis-à-vis the partnership and the roles partners take when acting on behalf of the partnership, I dissent.

That a partnership is an entity apart from the general partners cannot be seriously contested. RCW 25.05.050 ("A partnership is an entity distinct from its partners."). The distinction between partner and partnership is given practical effect throughout the Revised Uniform Partnership Act (RUPA), chapter 25.05 RCW. A partnership can acquire property and that property "is property of the partnership and not of the partners individually." RCW 25.05.060. In fact, the partner is not even considered co-owner of any partnership property. RCW 25.05.200. Similarly, a creditor cannot go after the partners' assets individually without first liquidating the partnership's assets and must obtain a separate judgment against the partners. RCW 25.05.130. Nor can a creditor of an individual

partner recover against the partnership for debts incurred outside of the ordinary course of the partnership's business. RCW 25.05.120. We interpret related statutes consistently and the lead opinion's attempt to follow the aggregate theory in only the liability context ignores RUPA's consistent and bright-line treatment of the partnership as a separate entity.

The agreement here was apparently between Northland Services Inc. (NSI) and ABCD Marine with Albert Boogaard acting as an agent of ABCD. That Boogaard was also a partner is of no import because RUPA states that "[e]ach partner is an agent of the partnership for the purpose of its business." RCW 25.05.100(1). Thus, the statute directs that Boogaard signed the contract as an agent but incurred liability as a partner. As discussed above, however, this liability must first flow through the partnership. Holding that Boogaard's possible joint and several liability on the agreement makes him a party to the contract ignores this fact as well as the fact that NSI would have to obtain an entirely separate judgment against Boogaard to enforce the contract against him personally.[1]

Understanding that any liability that might be incurred by Boogaard necessarily flows through the partnership and to him as a partner and not as an

---

[1] As a side note, the lead opinion also appears to ignore the general rule of construction that when the contract at issue is an insurance policy, ambiguities are resolved in favor of the policyholder, and exclusionary clauses are construed strictly against the insurer. *Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 340, 738 P.2d 251 (1987). This certainly would have weighed in Boogaard's favor.

agent of the partnership demonstrates why both the concurrence and lead opinion are mistaken to distinguish *Cowan Systems, Inc. v. Harleysville Mutual Insurance Co.*, 457 F.3d 368 (4th Cir. 2006). The lead opinion distinguishes *Cowan* based on the fact that there was a corporation there and a partnership here. But this distinction is only meaningful if the aggregate theory of the partnership is adopted and, as discussed above, RUPA treats partnerships as entities separate from the partners. The concurrence rightfully acknowledges that the choice of entity does not distinguish *Cowan*, but then goes on to reason that because Boogaard might be liable as a partner, he was a party to the indemnity agreement and therefore not a third party. This reasoning is flawed, however, because a partner's liability flows through the entity and requires a separate judgment. Accordingly, both opinions misapply *Cowan*, a case which is factually on point and should guide our resolution of the current case.

Because the lead opinion and concurrence's finding that Boogaard was a party to the indemnity agreement is based on a misunderstanding of how joint and several liability might be applied and an erroneous interpretation of RUPA, I respectfully dissent and would reverse the grant of summary judgment to the insurer.

Stephens, J.

Gordon McCloud, J.

González, J.