**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| MATTHEW JACOBS SHAFER, | ) | No. 78015-8-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| THE CITY OF SEATTLE, a municipal | ) | UNPUBLISHED OPINION |
| corporation, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

MANN, A.C.J. — Matthew Shafer appeals the trial court's summary judgment dismissal of his personal injury claim against the City of Seattle (City) arising out of his injury on a City park sports field. Shafer argues that the court erred in granting summary judgment because there were genuine disputes of material fact concerning: (1) whether the City breached its duty of care to Shafer and (2) whether the City should have reasonably anticipated the dangerous condition. We agree with Shafer and reverse.

I.

On July 22, 2014, Shafer was playing baseball on Legacy Field at Lower Woodland Park. Legacy Field is touted as the "premier" baseball venue operated by the City of Seattle Parks and Recreational Department (Parks). Shafer stepped backwards

in the outfield while tracking a pop-up fly ball when he tripped over a sprinkler head and fell, injuring his wrist.

The baseball infield is made of synthetic turf that does not require watering. The outfield is natural grass that does require watering. The City waters the outfield using an irrigation system with sprinkler heads that pop up 2 ½ inches to water, and then automatically retract when the system is turned off. The sprinkler heads on the field are Toro 640 brand sprinklers heads, which are the City's standard sports field sprinkler. The City considers the Toro 640 brand heads among the best quality and most reliable available, with an "excellent reputation for safety and effectiveness."

On days that the field is reserved for baseball games, a maintenance worker inspects the field prior to the scheduled games. The field is mowed twice a week by a worker who also inspects for irregularities in the field and problems with the sprinkler system. A senior gardener visits regularly to assess and maintain the turf and sprinkler system. Installation maintenance workers repair the irrigation system for specialized maintenance. All of the park workers are trained to look for trip hazards and report them. The sprinklers are tested and inspected several times a year, including at the beginning of the baseball season. Daily maintenance of the baseball field is performed by the Park's North Central Crew who are supervised by Colleen Hackett.

After Shafer filed a claim for damages against the City on March 27, 2015, Hackett and her team investigated the claim. Hackett claimed that she had never heard of a claim like Shafer's. Hackett explained that the City has used the Toro 640 as a standard sprinkler for over 30 years and the City was unaware of a prior incident of an individual tripping over a popped up sprinkler head. During her investigation, Hackett

2

did not find the sprinkler that Shafer tripped over to be in the up position. She consulted maintenance staff and checked work orders, but she did not find evidence of a prior incident involving a sprinkler head to be stuck in the up position. Hackett admitted she does not direct her employees to check every outfield sprinkler on a daily basis.

Shafer retained Stan Mitchell, a licensed architect experienced with irrigation systems, as an expert. Mitchell is generally familiar with the Toro products, including the Toro 640. Mitchell assessed the sprinkler that Shafer tripped over about three years after the incident and determined that it was improperly configured and maintained. He determined that the head was clogged with grit, which caused the sprinkler to protrude approximately one half to one inch up. He opined that the design of the Toro 640 makes it more susceptible to jamming from grit. Mitchell explained that if the head was protruding up half an inch to an inch above the mechanism, it would be very unlikely for someone to see it due to the head's color and position in the grass.

Mitchell opined further that it is common knowledge among those who routinely work with irrigation systems that sprinkler heads frequently fail to retract and remain stuck in the up position. As a result, common inspection and maintenance is required to protect pedestrians from these fall hazards. In Mitchell's opinion, there was a "general disregard" for pedestrian safety in the park, including another sprinkler head that was partially stuck in the up position on an adjacent ballfield. Mitchell was unaware of another case where a person tripped over a sprinkler head stuck in the up position. Mitchell opined that irrigation equipment should be inspected at the beginning of each season and periodically throughout the season.

3

Ed Jackson is the Assistant Facilities Maintenance Supervisor for the Parks and a trained plumber. Jackson claimed it was rare to have a sprinkler malfunction the way Shafer described. Jackson estimated that of the 20,000 sprinklers in the Parks department, about 5,000 of them are Toro-type sprinklers in athletic fields. Jackson stated that he doesn't know of an "industry standard, manufacturer specification, or other established protocol that recommends Toro 640 heads be individually inspected on a frequent or daily basis." He has seen the Toro 640s damaged by vandalism and stuck in the up position. Jackson estimates that City repairs approximately 500 Toro 640s a year.

Kevin Lince, a gardener for the Parks who tests irrigation systems, has seen the Toro 640 sprinkler heads stuck in the up position three or four times throughout the city. He explained that they get stuck because dirt gets into the valve, preventing it from closing. He did not consider a stuck sprinkler head to be a tripping hazard that needed to be fixed.

Larry Gable, a plumber with the City, has seen Toro 640s stuck in the up position seven or eight times over the years, due to various causes. He said that the heads do not fail without reason but can get stuck if dirt or mud gets washed up into them. Eric Prindle, another City plumber, has seen sprinkler heads stuck up approximately 10 times on City baseball fields, due to stuck grit and sand.

Jeremy Hadley, a baseball manager and a superintendent for Tulalip Water District and field foreman on irrigation maintenance, witnessed Shafer's fall. Hadley asserted that he has seen sprinkler heads stuck up many times. He said that sprinklers getting clogged is a common occurrence.

4

For the purposes of summary judgment, the City conceded and the court assumed that the sprinkler had been in the defect position for 12 hours, corresponding with the last water cycle. The City also conceded that Shafer was an invitee. Shafer's counsel argued that the City had a duty to inspect the fields on a more "rigorous" basis but agreed that daily of inspection of each sprinkler head was unreasonable.

The City moved for summary judgment, arguing that Shafer could not establish that the City had actual or constructive notice of the defect, and that the risk here was unforeseeable. Shafer argued that genuine issues of material fact precluded summary judgment. The court granted summary judgment. Shafer moved for reconsideration under CR 59, which the court denied. Shafer appealed.

During discovery, the City initially produced its "Athletic Field Maintenance Guide" (Guide). On the first page, under "Baseball Field Prep, the Guide reads:

> The purpose of baseball field maintenance is just that, preparing an infield area for the rigors of pitching, batting, running, sliding as well as all of the other actions that take place during the course of a baseball game . . . The most important function in preparing any baseball field is safety. All obstacles and hazards must be removed or corrected before the players set foot on the field. Preventing the occurrence of injuries is always foremost in the mind of any conscientious ball field technician. That being the case, this manual is dedicated to safety and designed to provide guidance in preparing a safe, well-groomed and properly laid out baseball field.

Under the page title "Skinned Infield Maintenance" the Guide explains: "Inspection: daily on both infield and outfield using a checklist for infrastructure and turf areas." In her deposition, Hackett testified that she had never seen a separate checklist document.

The City later produced another version of the Guide after summary judgment. The City disclosed this evidence shortly before Shafer's original appellate brief was due. The parties agreed to stay the original appeal while the parties addressed the new

5

evidence. The newer version produced after summary judgment included a "Ball Field Inspection Form." The City claimed that the version of the Guide had been stored in a packet with the "Ball Field Inspection Form" improperly. The City maintains that the "Ball Field Inspection Guide" is not the inspection checklist referenced in the Guide.

Shafer brought a CR 60 motion for relief on the new evidence, which was denied. Shafer appealed, and this court consolidated the two appeals.

II.

This court reviews summary judgment decisions de novo. Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 281, 313 P.3d 395 (2013). "Summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Int'l Marine Underwriters, 179 Wn.2d at 281. The moving party has the initial burden of proving the absence of an issue of material fact. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A fact is material if "the outcome of the litigation depends [on it] in whole or in part." Hash by Hash v. Children's Ortho. Hosp. & Med. Ctr., 110 Wn.2d 912, 915, 757 P.2d 507 (1988). All reasonable inferences must be resolved against the moving party, and the motion may be granted only if reasonable people could reach but one conclusion. Hash, 110 Wn.2d at 915.

A court must apply the standard of proof which will apply at trial when ruling on a motion for summary judgment. Gossett v. Farmers Ins. Co. of Washington, 133 Wn.2d 954, 973, 948 P.2d 1264 (1997). To establish a claim for negligence, the plaintiff must establish: (1) the existence of a duty to plaintiff; (2) breach of that duty; (3) resulting injury; and (4) proximate cause between the breach and the injury. Hutchins v. 1001

Fourth Ave. Assocs., 116 Wn.2d 217, 220, 802 P.2d 1360 (1991). The question before us is whether the City owed a duty to Shafer.

The legal duty owed by a landowner to a person entering the premises depends on if the person is a trespasser, licensee, or invitee. Fuentes v. Port of Seattle, 119 Wn. App. 864, 869, 82 P.3d 1175 (2003). The highest degree of care is owed to invitees. Fuentes, 119 Wn. App. at 869. A landowner is subject to liability for physical harm caused to invitees by a condition on the land if, but only if he or she

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965); Iwai v. State, 129 Wn.2d 84, 93-94, 915 P.2d 1089 (1986); Charlton v. Toys "R" Us, 158 Wn. App. 906, 912-13, 246 P.3d 199 (2010).

The general rule governing liability for failure to maintain premises in a reasonably safe condition is that: (1) the unsafe condition must either be caused by the owner or his employees or (2) the owner must have actual or constructive notice of the unsafe condition. Pimentel v. Roundup Co., 100 Wn.2d 39, 49, 666 P.2d 888, 893 (1983). The plaintiff is excused from proving notice when the City should have reasonably anticipated the condition would develop. Nguyen v. City of Seattle, 179 Wn. App. 155, 165, 317 P.3d 518 (2014). Constructive notice arises if the condition existed for a period of time so that the municipality should have discovered its existence through the exercise of reasonable care. Niebarger v. City of Seattle, 53 Wn.2d 228,

7

230, 332 P.2d 463 (1958). "Whether one charged with negligence has exercised reasonable care is ordinarily a question of fact for the trier of fact." Bodin v. City of Stanwood, 130 Wn.2d 726, 735, 927 P.2d 240 (1996).

The owner's obligation of reasonable care "extends to everything that threatens the invitee with an unreasonable risk of harm." Coleman v. Ernst Home Ctr. Inc., 70 Wn. App. 213, 222, 853 P.2d 473 (1993). The owner has a duty to inspect for possibly dangerous conditions of which he does not know and to reasonably repair the condition or warn the invitee in order to protect the invitee from foreseeable dangers. Coleman, 70 Wn. App. at 222-23. However, owners are not liable for harm from conditions where the unreasonable risk of harm was not anticipated. Coleman, 70 Wn. App. at 223.

The City relies principally on Coleman and Fredrickson v. Bertolino's Tacoma, Inc., 131 Wn. App. 183, 127 P.3d 5 (2005), to support its claim that Shafer cannot establish the requisite notice. In Coleman, a police officer was leaving a store after looking for a suspect when she tripped over a hole in the carpeting and fell. Coleman, 70 Wn. App. at 215. The officer did not see the hole, which was 12 inches long and 3 ½ inches wide. Coleman, 70 Wn. App. at 215. The store manager knew of three to four times that the carpeting had come loose or had pieces missing previously. Coleman, 70 Wn. App. at 215. Safety inspections were only done once a day, although employees were supposed to promptly report dangerous conditions. Coleman, 70 Wn. App. at 216. There was no evidence anyone actually saw the hole before the officer fell. Coleman, 70 Wn. App. at 216. The court found that the officer had failed to prove evidence of actual or constructive notice and affirmed the directed verdict. Coleman, 70 Wn. App. at 218.

In Frederickson, when the plaintiff sat down at a table in a coffee shop, the chair broke and gave way. Fredrickson, 131 Wn. App. at 127. The store manager inspected each chair once a week and immediately fixed an unstable chair when it was brought to his attention. Fredrickson, 131 Wn. App. at 187. The manager estimated that he threw away four chairs a year and that he repaired another four to five chairs a year. Fredrickson, 131 Wn. App. at 187. The plaintiff complained that the inspection procedures were inadequate, but he offered no evidence that the manger failed to inspect the chairs or that his inspection routine did not meet industry standards. Fredrickson, 131 Wn. App. at 190. The court held that the plaintiff failed to present evidence that that shop had either actual or constructive notice of problems with its chairs, and affirmed the motion granting summary judgment. Fredrickson, 131 Wn. App. at 183.

Unlike Coleman and Frederickson, the City imposed a rigorous standard of daily inspection on itself. The City's Guide requires daily inspection of the infield and outfield. The Guide specifies that "all obstacles and hazards must be removed or corrected before the players set foot on the field." Yet the City employees failed to follow this standard. All the Parks employees testified that they had seen sprinkler heads stuck in the up position. Although the outfields of the baseball field were inspected before scheduled games, Hackett admitted that she does not regularly direct employees to investigate the individual outfield sprinklers. Further, some employees did not consider stuck sprinkler heads to be a tripping hazard. In Coleman and Frederickson, the businesses did not have a manual requiring daily inspection and the removal of all

9

hazards. Because the City had the Guide with more extensive safety standards, a jury could reasonably find that the City breached its duty of care to Shafer.

In addition, the fact that this field is used for baseball, where someone is not looking at the ground during play, further distinguishes this case from Frederickson and Coleman. The intended use of the field makes the tripping hazard more dangerous within this context. If the City could not inspect each sprinkler head in the outfield, posting a warning sign explaining this to players is a reasonable alternative. Through the employee depositions and his expert report, Shafer has demonstrated a dispute of fact whether the City should have anticipated the dangerous condition.

Shafer also produced evidence supporting that a jury could find that the stuck sprinkler head is an unreasonably dangerous condition. Mitchell opined that stuck sprinkler heads are a frequent occurrence, requiring maintenance to prevent patrons from tripping over the hazard. Mitchell reasoned that this particular head was likely not maintained correctly, as it had become clogged with grit. Due to the dark green color of the sprinkler head, a stuck head in the outfield is almost impossible to see. In fact, Shafer did not even see the stuck sprinkler until after he had fallen and been injured. Although the failure rate of the sprinklers may be five percent and these instances are rare, Shafer has still provided evidence that there were multiple instances of the City's sprinklers becoming stuck in the upright position. Further, the City employees' testimony contrasts with the City's own maintenance guide, which requires preparing baseball fields for safe use, including inspection of the outfield. Hackett and Lince's testimony reveal that stuck sprinkler heads may not be inspected or repaired as part of the field preparation. When considering that the field is used for playing sports, which

often involve players focusing on the game, rather than their footing, Shafer has demonstrated that there was an issue of material fact of if the stuck sprinkler head was unreasonably dangerous.

Finally, Shafer demonstrated that there was a dispute of material fact of whether the City should have discovered the defective sprinkler in 12 hours. Although the City did not have actual notice that the particular sprinkler head was stuck, Shafer's evidence shows that the City had constructive notice of stuck heads, therefore, genuine issues of material fact exist on whether the City should have discovered the head in 12 hours. The length of time the sprinkler was stuck and the opportunity for the City to discover are determinative of if the City had constructive notice. Shafer demonstrated that the City's ordinary care and inspections would have allowed the City time to discover the stuck head. The City's maintenance guide provides for daily inspection of the outfield. Despite the City's extensive inspection standards, the sprinkler remained undetected until after Shafer tripped. Shafer concedes that it would be unreasonable for the City to inspect each of 10,000 sprinkler heads a day. However, Shafer is not asking the City to assume such a duty, but rather, that it would be reasonable to inspect the outfield for stuck sprinkler heads before a baseball game to prevent the injury like Shafer suffered or to give a warning to players about the risk of trip hazards. Shafer offered evidence to demonstrate that the City should have discovered the sprinkler within twelve hours through its maintenance procedures, therefore, genuine issues of material fact exist.

Because there are disputed issues of material fact on whether the sprinkler head was an unreasonably dangerous condition that should have been discovered by the City, summary judgment was not appropriate.

Reversed.

_Mann, ACJ._

WE CONCUR: