## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LEXINE OTEY, individually and on behalf of the class of similarly situated insureds, | ) ) ) ) | DIVISION ONE<br><br>No. 74448-8-I |
| Appellant, | ) ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| GROUP HEALTH COOPERATIVE, a corporation, | ) ) ) | |
| Respondent. | ) ) ) | FILED: May 15, 2017 |

TRICKEY, J. — Lexine Otey, a member of the Group Health Cooperative (GHC), appeals the trial court's grant of GHC's motion for summary judgment and dismissal of her claims. Otey claims that GHC breached its contract by overcharging its insureds for prescription drugs, and violated the Consumer Protection Act[1] (CPA). Specifically, Otey claims that the contract is ambiguous and cannot be reasonably interpreted to allow GHC to charge its members more than the wholesale cost it paid for prescription drugs. Otey's offered interpretation is not reasonable when read in the context of the entire contract. Because nearly all of Otey's arguments rely on her breach of contract argument, and her other arguments are similarly without merit, we affirm.

---

[1] Ch. 19.86 RCW.

FACTS

Otey is a Member of GHC, meaning she is insured under GHC's health insurance plan. She is covered by GHC's Group Medical Coverage Agreement (the Agreement). Under the Agreement, Members pay at most a $15 copayment for preferred generic drugs (Tier 1), a $30 copayment for preferred brand name drugs (Tier 2), and 100 percent of all charges for nonpreferred generic and brand name drugs (Tier 3). The Agreement defines the terms "Copayment" and "Cost Share" in its Definitions section.[2]

Otey claims that GHC overcharged her for prescription drugs. For example, she was prescribed Methocarbamol and was charged a $13.60 copayment for 28 tablets; the wholesale cost to GHC was between $3.00 and $5.00.

Otey filed a complaint against GHC individually and on behalf of similarly situated Members. She alleged that GHC breached the Agreement by failing to contribute to the payment for prescription drugs despite the terms "Copayment" and "Cost Share" appearing in the Agreement. Otey also claimed that GHC violated the CPA by acting in bad faith when it failed to make copayments or share in the cost of drugs, and did not disclose information that would be material to an objectively reasonable person.

GHC moved for summary judgment. The trial court granted GHC's motion and dismissed Otey's claims. The trial court found that GHC did not breach the Agreement because the challenged definitions were not ambiguous, and did not require GHC to share in the cost of any particular service. The trial court dismissed

_____

[2] Clerk's Papers (CP) at 138, 190.

Otey's CPA claim because the Agreement was not ambiguous and GHC followed its terms.

Otey appeals.

## ANALYSIS

Otey maintains that the trial court erred by granting summary judgment to GHC. She first argues that the trial court erred because GHC breached the Agreement because it required GHC to share in the cost of Tier 1 and Tier 2 prescription drugs, and GHC wrongfully overcharged its Members when it failed to do so. Otey next contends that GHC violated the CPA by acting in bad faith when it overcharged its Members and did not disclose its wholesale costs. We consider each of her claims in turn.

"Appellate review of summary judgment is de novo; the reviewing court engages in the same inquiry as the trial court and views the facts and the reasonable inferences from those facts in the light most favorable to the nonmoving party." Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794, 64 P.3d 22 (2003). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 281, 313 P.3d 395 (2013); CR 56(c).

### Breach of Contract

Otey argues that the trial court erred by granting GHC's motion for summary judgement on her breach of contract claim. Otey asserts that GHC breached the Agreement by overcharging its Members. Otey relies on the Agreement's use of

- 3 -

the terms "Cost Share" and "Copayment" to claim that GHC was required to share in the cost of covered drugs. She further contends that GHC should not have charged her more than the wholesale cost of the drugs because the Agreement states that a Member's copayment will never exceed the "actual charge" incurred. Alternatively, she argues that GHC wrongfully excluded coverage of Tier 1 and Tier 2 drugs under the Agreement.

To prevail on a breach of contract claim, the plaintiff must show the elements of duty, breach, causation, and damages. Baldwin v. Silver, 165 Wn. App. 463, 473, 269 P.3d 284 (2011). To avoid summary judgment, a plaintiff must produce evidence raising genuine issues of material fact as to each element of the claim for breach of contract. Baldwin, 165 Wn. App. at 473. If the duty allegedly breached is not in the contract, the claim of breach of contract cannot be sustained. Fid. & Deposit Co. of Md. v. Dally, 148 Wn. App. 739, 745-46, 201 P.3d 1040 (2009).

*Defined Terms "Cost Share" and "Copayment" Ambiguity*

Otey argues that the trial court erred in granting summary judgment on her breach of contract claim because GHC breached the Agreement by overcharging its Members. Specifically, she argues that the terms "Cost Share" and "Copayment" may be reasonably interpreted to require GHC to share in the cost of covered drugs, and by failing to do so GHC overcharged its Members. Because "Cost Share" and "Copayment" are defined terms in the Agreement with only one reasonable interpretation, and did not allow GHC to overcharge its Members, we find no error.

The court examines the terms of an insurance contract under their plain language to determine whether there is coverage. Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 784 P.2d 507 (1990). "In Washington, . . . 'the [insurance] policy is construed as a whole, and the policy should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" Kitsap County v. Allstate Ins. Co., 136 Wn.2d 567, 964 P.2d 1173 (1998) (internal quotation marks omitted) (quoting Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126 Wn.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994)).

"When interpreting insurance contracts, courts use the same interpretive techniques employed on other commercial contracts." Int'l Marine Underwriters, 179 Wn.2d at 282. Defined terms are interpreted in accordance with the definition provided in the policy. Kitsap County, 136 Wn.2d at 576. If the language of an insurance policy is clear and unambiguous, a court may not modify the policy or create an ambiguity. Am. Star Ins. Co. v. Grice, 121 Wn.2d 869, 874, 854 P.2d 622 (1993).

Interpretation of a writing is a question of law that is reviewed de novo. Stewart v. Chevron Chem. Co., 111 Wn.2d 609, 613, 762 P.2d 1143 (1988).

Here, the Financial Responsibilities for Covered Services section of the Agreement states that Members are responsible for costs for a Covered Service up to the Cost Shares amount. The Agreement defines "Cost Share" as "[t]he portion of the cost of Covered Services for which the Member is liable. Cost Share

-5-

includes Copayments, coinsurances and Deductibles."[3,4] "Copayment" is defined in the Agreement as "[t]he specific dollar amount a Member is required to pay at the time of service for certain Covered Services."[5] The Copayment amount for Tier 1 drugs is $15.

When the Agreement is read as a whole, the defined terms Cost Share and Copayment are not ambiguous. Cost Share includes Copayments within its definition. Copayments are specific dollar amounts that act as a ceiling on the amount a Member must pay for Covered Services. Copayments do not require either party to pay a percentage of the cost of Covered Services.

The disputed terms in the Agreement are contained in the Financial Responsibilities section. This section does not mention any responsibility of GHC to contribute to the payment of Covered Services that cost less than the Copayment value. Rather, it states that "[t]he Subscriber is liable for payment of the following Cost Shares for Covered Services."[6] For the purposes of Tier 1

---

[3] CP at 138, 190.
[4] GHC cites the Washington Administrative Code (WAC) as additional support that the definitions in the Agreement are valid, although the Agreement does not incorporate them. The WAC provisions cited by GHC closely match those in the Agreement, thereby lending support to its offered interpretation. GHC is a health maintenance organization, which is responsible for providing "comprehensive health care services to enrolled participants of such organization on a group practice per capita prepayment basis or on a prepaid individual practice plan, except for an enrolled participant's responsibility for copayments and/or deductibles." RCW 48.46.020(13); WAC 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(15). "Cost-sharing" is defined as "amounts paid to health carriers directly providing services, health care providers, or health care facilities by enrollees and may include copayments, coinsurance, or deductibles." WAC 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(9). Cost-sharing in the context of prescription drugs means "amounts paid directly to a provider or pharmacy by an enrollee for services received under the health benefit plan, and includes copayment, coinsurance, or deductible amounts." WAC 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(1).
[5] CP at 138, 190.
[6] CP at 100, 153.

prescription drugs, the Agreement shows that Members are liable for up to $15, which would not affect GHC's responsibility to pay. But any amount for a Covered Service exceeding the Cost Shares value would be paid by GHC under the Agreement. Therefore, when the definitions of the challenged terms are read in the context of the Agreement as a whole, they are not ambiguous.

Otey argues that the term Cost Share is ambiguous for two reasons. First, she alleges that the average person would interpret it to mean that GHC would be responsible for paying a portion of the cost of drugs, rather than shifting the entire cost to the Member. Otey next cites the undefined phrase "portion of the cost" contained in the definition of Cost Share to argue that, due to the use of this term in the Agreement's Financial Responsibilities section, GHC was required to share in the cost of prescription drugs with the insured Member.[7]

Otey's arguments are unpersuasive for three reasons. First, Cost Share explicitly includes Copayments in its definition, which in turn are set amounts listed in the Agreement that act as a ceiling on the price Members will be required to pay for certain Covered Services. Second, GHC will pay a portion of the cost of Tier 1 drugs, but only if the actual charge incurred by the Member for the drugs is greater than the $15 Copayment value. Third, after a Member reaches her "Out-of-pocket Limit" for the year, GHC is solely responsible for paying any further Cost Shares.[8] The Agreement does not make GHC responsible for the costs Otey incurred simply because the Copayment threshold was not reached.

---

[7] CP at 138, 190.
[8] CP at 102, 140.

-7-

In the alternative, Otey argues that the Agreement does not adequately define the term Cost Share, and that this court should use dictionary definitions to determine its common meaning. Courts give undefined terms in a policy their "'plain, ordinary, and popular' meaning." Boeing Co., 113 Wn.2d at 877 (quoting Farmers Ins. Co. v. Miller, 87 Wn.2d 70, 73, 549 P.2d 9 (1976)). Courts may look to standard English dictionaries to determine the ordinary meaning of undefined terms. Kitsap County, 136 Wn.2d at 576. But the Agreement defines both Cost Share and Copayment. Therefore, neither term is undefined. We decline to adopt Otey's proposed dictionary definitions.

*"Actual Charge"*

Otey argues that summary judgment on her breach of contract claim was improper because GHC overcharged its Members when it charged them more than its wholesale cost of purchasing drugs. Specifically, Otey argues that the undefined term "actual charge" in the Agreement can be reasonably interpreted to require GHC to charge Otey only the amount it paid for a drug. Otey contends that the term is ambiguous and should be interpreted in favor of Otey, as the policyholder. Although "actual charge" is undefined, it can only have one reasonable interpretation when read in the context of the Agreement as a whole. Therefore, we find no error.

"The insurance contract must be viewed in its entirety; a phrase cannot be interpreted in isolation." Allstate Ins. Co. v. Peasley, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997). If the language of an insurance policy is clear and unambiguous, the court must enforce it as written. Transcontinental Ins. Co. v.

- 8 -

Wash. Pub. Utils. Dists.' Util. Sys., 111 Wn.2d 452, 456, 760 P.2d 337 (1988). Language of an insurance contract is ambiguous if it is fairly susceptible to two different reasonable interpretations. Am. Star, 121 Wn.2d at 874. Any ambiguity is resolved in favor of the policyholder. Eurick v. Pemco Ins. Co., 108 Wn.2d 338, 340, 738 P.2d 251 (1987).

Undefined terms in an insurance policy are given their ordinary and common meaning. Peasley, 131 Wn.2d at 424. To determine the ordinary meaning of undefined terms, courts may look to standard English dictionaries. Kitsap County, 136 Wn.2d at 576. The contract must be read as an average person would read it, and given a practical and reasonable interpretation. Moeller v. Farmers Ins. Co. of Wash., 173 Wn.2d 264, 272, 267 P.3d 998 (2011).

Interpretation of the language of an insurance policy is a matter of law that this court reviews de novo. Peasley, 131 Wn.2d at 423-24.

Here, the phrase "actual charge" appears in the Financial Responsibilities section of the Agreement:

> The Subscriber is liable for payment of the following Cost Shares for Covered Services provided to the Subscriber and his/her Dependents. Payment of an amount billed must be received within 30 days of the billing date. Charges will be for the lesser of the Cost Shares for the Covered Service or the actual charge for that service. Cost Shares will not exceed the actual charge for that service.[9]

"Covered Services" are "services for which a Member is entitled to coverage in the Benefits Booklet."[10] As explained above, "Cost Share" is the "portion of the cost of Covered Services for which the Member is liable," and includes

---

[9] CP at 100, 153.
[10] CP at 138, 190.

-9-

Copayments.[11] "Copayment" is the specific dollar amount a Member must pay at the time of service.[12]

Cost Shares act as a ceiling on the cost a Member can incur for a Covered Service. If the actual charge billed to a Member for a given Covered Service is lower than the Cost Share assigned to that service, the Member is responsible for only the actual charge incurred when the Member receives the Covered Service. The Agreement further states that Cost Shares will not exceed the actual charge for that service. If the actual charge incurred by the Member is lower than the Copayment value, the Member is responsible for paying the actual charge incurred. If the actual charge incurred is greater than the Copayment, the Member is responsible for the Copayment only.

The Financial Responsibilities for Covered Services section of the Agreement lays out the costs the Member is responsible for paying. It does not contain formulas or qualifiers that use the costs incurred by GHC in procuring drugs or services as a reference point for determining the cost charged to the Member. As written, and when viewed in the context of the preceding language referring only to the payment of the amount billed to the Member, "actual charge" may only be reasonably interpreted as comparing the actual amount billed to a Member upon receiving a service to the Copayment value assigned to that service. Although the word "actual" could mean wholesale cost or otherwise limit the costs

---

[11] CP at 138, 190.
[12] CP at 138, 190.

GHC may charge Members in a different type of contract, here there is no language in the Agreement that can support this interpretation.

Otey's offered definition of "actual charge" as the wholesale cost imposed on GHC attempts to reach beyond the scope of the contract as written and incorporate terms and values that are not contained within the Agreement. The Agreement does not incorporate any third party costs into its listed Copayment values. The complete absence of such values means that the phrase "actual charge" cannot be reasonably interpreted to mean GHC's wholesale cost to purchase the drugs. The Agreement's scope is confined to the costs Members are responsible for while under GHC's insurance coverage.

Otey argues that other parts of the Agreement beyond the Financial Responsibilities section demonstrate that "actual charge" also could mean either costs incurred by Members or by GHC. The Agreement states that "[i]n the event the Member elects to purchase a brand-name drug instead of the generic equivalent (if available), the Member is responsible for paying the difference in cost in addition to the prescription drug Cost Share."[13] Otey argues that this language could be reasonably interpreted to mean either the charge incurred by GHC to purchase the drugs or the price charged by GHC to the Member. As discussed above, the Agreement concerns only the financial responsibilities between the Members and GHC, and never mentions GHC's own costs. The additional language cited by Otey does not support her argument that "actual charge" means the cost incurred by GHC.

---

[13] CP at 109, 161.

- 11 -

Otey's claim that GHC breached the Agreement by charging its Members more than the wholesale costs of the drugs under the "actual charge" language is not a reasonable interpretation of the Agreement, and was properly dismissed.

Relying on federal cases that have held that "actual charge" is ambiguous in the context of supplemental cancer insurance contracts, Otey argues that "actual charge" is always ambiguous when used in health insurance contracts. See, e.g., Pedicini v. Life Ins. Co. of Ala., 686 F.Supp.2d 692 (W.D. Ky. 2010), ("actual charge" in context of supplemental cancer insurance contract could reasonably mean either the amount charged by the medical provider to the patient or a different amount accepted by the medical provider from a third party as payment in full), rev'd in part on other grounds, 682 F.3d 522 (6th Cir. 2012).

In supplemental cancer insurance contracts, direct payments are made to the policyholder when an insured patient undergoes covered cancer treatments. Pedicini, 686 F.Supp.2d at 694. These benefits are paid regardless of whether the patient has other insurance sufficient to cover all medical expenses. Pedicini, 686 F.Supp.2d at 694. When the patient has other insurance covering cancer treatments, the policyholder is able to retain the money as a result of the supplemental coverage. Pedicini, 686 F.Supp.2d at 694. This arrangement renders "actual charge" ambiguous because the insured patient may have to pay either (1) the total amount billed, or (2) the amount a health care provider would be willing to accept as payment in full. Pedicini, 686 F.Supp.2d at 696.

The cases cited by Otey are distinguishable from the present case. The section of the Agreement at issue here concerns Members' responsibility to pay

the Cost Shares listed under the Agreement. The only cost that could be incurred by the Member under the Agreement for Covered Services would be the lesser of the Copayment listed or the "actual charge." This is distinguishable from insurance contracts under which there could be both a total amount billed to the insured and an amount that the provider would accept as payment in full. Because "actual charge" can only be reasonably interpreted to mean one amount in the context of the Agreement, it does not create the ambiguity found in the federal cases relied on by Otey.

*Coverage of Tier 1 and Tier 2 Drugs*

Otey argues that Tier 1 and Tier 2 prescription drug benefits are within the scope of the Agreement's coverage, but GHC wrongfully claims that it has no duty to pay any portion of their cost. Otey contends that GHC wrongfully made Members pay the entire cost of drugs, as well as any profit GHC decided to add to the price. Otey calls this a "phantom exclusion." Because GHC is responsible for costs of Covered Services that exceed the assigned Cost Shares value and becomes responsible for the entire cost of Covered Services after a Member reaches his or her Out-of-pocket Limit, we find no error.

Courts interpret insurance policies liberally in order to provide coverage wherever possible. Patriot Gen. Ins. Co. v. Gutierrez, 186 Wn. App. 103, 110, 344 P.3d 1277 (2015); Bordeaux, Inc. v. Am. Safety Ins. Co., 145 Wn. App. 687, 694, 186 P.3d 1188 (2008). Exclusionary terms from insurance coverage are construed narrowly because they are contrary to the protective purpose of insurance. Vision One, LLC v. Phila. Indem. Ins. Co., 174 Wn.2d 501, 507, 512, 276 P.3d 300 (2012)

- 13 -

(exclusion of losses "caused by or resulting" from deficient design or faulty workmanship). Insurers have the burden of drafting exclusions in clear and unequivocal terms. Int'l Marine Underwriters, 179 Wn.2d at 288 (policy containing exclusion for contractually assumed liability with an exception for "insured contracts").

As discussed above, the Cost Share and Copayment terms are not ambiguous and do not require GHC to share in the cost of each transaction. Under the Agreement, GHC is responsible for payment of Covered Services costs exceeding the Copayment value, and also for any costs incurred by the Member after his or her Out-of-pocket Limit has been reached. GHC does not exclude the costs of Tier 1 or Tier 2 drugs from its coverage because the amounts paid by a Member count toward his or her Out-of-pocket Limit. After a Member reaches the Out-of-pocket Limit, which includes all Cost Shares for Covered Services incurred by the Member over the calendar year, GHC becomes solely responsible for additional costs. Further, if the cost of a Tier 1 drug exceeds the $15 Copayment or a Tier 2 drug exceeds the $30 Copayment, GHC covers the excess. Under the Agreement, there is no "phantom exclusion" of Tier 1 drugs.

The exclusions in the cases cited by Otey are distinguishable from GHC's coverage of Tier 1 and Tier 2 drugs. The insurance policies at issue contained explicit exclusionary clauses that barred coverage for specific events. See, e.g., Vision One, LLC, 174 Wn.2d at 507 (term excluding coverage for loss or damage caused by specified events). These cases do not support Otey's argument that GHC implicitly excludes Tier 1 and Tier 2 drugs, as there is no exclusionary term

to construe narrowly. Otey does not challenge GHC's exclusion of Tier 3 drugs from coverage under these cases.

Otey argues that Tier 1 and Tier 2 drugs are treated practically the same as Tier 3 drugs, which are explicitly excluded from coverage, because few Tier 1 and Tier 2 drugs will cost more than their Copayment value. Otey does not offer legal authority in support of this argument. As discussed above, this ignores that GHC is responsible for any actual charge exceeding the Copayment value for Tier 1 and Tier 2 drugs, and that GHC is responsible for any Cost Shares incurred after the Member reaches their annual Out-of-pocket Limit.

Otey argues that the trial court erred in applying an "aggregate" cost-sharing theory to the Agreement.[14] This argument is inapplicable. Cost-sharing via copayments and coinsurance assure that both the subscriber and insurance company share in annual pharmacy expenditures. Regence Blueshield v. Office of the Ins. Comm'r, 131 Wn. App. 639, 650, 128 P.3d 640 (2006). Recognized methods of cost-sharing "create a finite and predictable annual expenditure for the subscriber (deductible) or they assure that the subscriber and the insurance company share in all annual pharmacy expenditures (copayments and

---

[14] Otey also argues that the trial court erroneously considered only GHC's unilateral intent when interpreting the Agreement to require GHC to only share in costs when the "actual charge" exceeded the Cost Share value or after a Member's Out-of-pocket Limit was reached, rather than the language of the Agreement. Washington courts determine the parties' intent by focusing on the objective manifestations in the agreement, rather than on unexpressed subjective intent of the parties. Hearst Commc'ns v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Here, as discussed above, the language of the Agreement is not ambiguous. The Financial Responsibilities section requires that Members pay the lower of the Cost Share or "actual cost" incurred. The trial court did not impermissibly rely only on GHC's unilateral intent when it interpreted the Agreement, as it could look to the language of the Agreement to reach its conclusions.

coinsurance)." Regence Blueshield, 131 Wn. App. at 650. A benefit cap limiting a provider's liability that exposes insureds to unpredictable and limitless upper liability is invalid. Regence Blueshield, 131 Wn. App. at 650-51.

The Agreement uses cost-sharing mechanisms recognized by Washington courts. The Agreement contains clear Copayment values which limit a Member's liability for costs of Tier 1 and Tier 2 drugs. In addition, a Member's annual liability for costs is limited by the Out-of-pocket Limit contained in the Agreement. Both of these act as limits on a Member's liability, and do not impermissibly limit GHC's responsibility to cover expenses. The trial court's use of the word "aggregate" to describe the cost-sharing arrangement in the Agreement is irrelevant.

### Otey's CPA Violation Claim

Otey argues that the trial court erred when it dismissed her CPA claim. Otey argues that GHC breached the Agreement when it overcharged Members by failing to share in the cost of drugs, and therefore breached the CPA. In the alternative, Otey argues that her CPA claim is an independent claim with unresolved issues of fact to be decided by a jury. Neither argument has merit.

Otey first argues that the trial court erred when it dismissed her CPA violation claim based on its finding that GHC did not breach the Agreement. Otey argues that this court should reinstate her CPA violation claim if we reverse the dismissal of her breach of contract claim. Because we find that Otey's breach of contract claim was properly dismissed, we decline to reinstate her CPA violation claim on that basis.

In the alternative, Otey argues that the trial court erred in dismissing her CPA violation claim because it is independent of the breach of contract claim and depends on unresolved questions of fact. Specifically, she argues that GHC acted in bad faith and did not put forward any evidence that its interpretation of the Agreement was reasonable beyond argument and the Agreement itself. Otey maintains that this was insufficient for summary judgment, and the question of GHC's reasonableness should have gone to a jury.

Parties may bring bad faith claims against their insurer because the insurance company has a quasi-fiduciary duty to its insureds. Cedell v. Farmers Ins. Co. of Wash., 176 Wn.2d 686, 696, 295 P.3d 239 (2013). Good faith requires an insurer to deal fairly with insureds. Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 161 Wn.2d 903, 915 n. 9, 169 P.3d 1 (2007).

Whether an insurer acted in bad faith remains a question of fact. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484, 78 P.3d 1274 (2003). To succeed on a bad faith claim against an insurer, a policyholder must show the insurer's breach of an insurance contract was unreasonable, frivolous, or unfounded. Smith, 150 Wn.2d at 484.

An insurer is entitled to a directed verdict or a dismissal on summary judgment only if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances or the insurer is entitled to prevail as a matter of law on the facts construed most favorably to the nonmoving party. Smith, 150 Wn.2d at 484.

Otey relies primarily on Coventry Associates v. American States Insurance Co., 136 Wn.2d 269, 961 P.2d 933 (1998). In that case, Coventry submitted a claim to American States for damages that occurred in one of its construction projects. Coventry Assocs., 136 Wn.2d at 274. An American States adjuster briefly investigated the project site and then denied the claim without investigating the cause of the damage or loss of business coverage, and with minimal review of Coventry's policy. Coventry Assocs., 136 Wn.2d at 274. The Supreme Court held that an insured may maintain an action against its insurer for a bad faith investigation of the insured's claim and for violation of the CPA regardless of whether the insurer was ultimately correct in determining coverage did not exist. Coventry Assocs., 136 Wn.2d at 279.

On appeal, Otey asserts only that GHC did not offer evidence beyond argument and that its interpretation of the Agreement was reasonable. Otey does not allege any act of bad faith separate from GHC's interpretation of the Agreement. As discussed above, GHC did not breach Agreement by overcharging its Members. Because Otey does not allege an act of bad faith separate from GHC's alleged breach of the Agreement, Coventry Associates is inapplicable to the present case. Therefore, there is no disputed material fact pertaining to the reasonableness of GHC's alleged breach of the Agreement, and Otey's CPA violation claim does not have a basis independent from her breach of contract claim. We conclude that the trial court did not err in dismissing Otey's CPA violation claim.

Affirmed.

Trickey, J

WE CONCUR:

Becker, J.