IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CASCADE CONCRETE INDUSTRIES, INC., A WASHINGTON CORPORATION, | ) ) ) ) | No. 40429-3-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| CENTRAL WASHINGTON ASPHALT, INC., A WASHINGTON CORPORATION; SAFECO INSURANCE COMPANY OF AMERICA, BOND NO. 6425449, | ) ) ) ) ) ) | |
| Respondents. | ) ) | |

COONEY, J. — Cascade Concrete Industries, Inc. (Cascade) entered into a contract

with Central Washington Asphalt, Inc. (CWA), a major highway contractor, to supply

sound barrier walls. The contract required CWA to pay Cascade for extra costs

associated with alterations or deviations to the walls. A 1.5 percent monthly interest

charge would be applied to any invoice that CWA failed to timely remit.

Cascade sued after CWA refused to pay the extra costs incurred in manufacturing the walls. A jury found CWA breached the contract and awarded Cascade $625,968.00 in damages. Thereafter, the trial court declined to award Cascade prejudgment interest and limited postjudgment interest to the statutory rate of 12 percent rather than Cascade's demand for the contract rate of 18 percent.

Cascade appeals, arguing the trial court erred in: (1) failing to award prejudgment interest at a rate of 18 percent, (2) refusing to award Cascade prejudgment interest on its liquidated claim, and (3) refusing to award Cascade the contractual postjudgment interest at the rate of 18 percent. Both parties seek attorney fees and costs on appeal. We disagree with each contention and affirm.

## BACKGROUND

CWA, a contractor specializing in major highway construction projects for the state of Washington, contracted with the Washington State Department of Transportation (WSDOT) for a significant road construction project on State Route 17 (SR 17) near Moses Lake, Washington.

In August 2006, CWA contracted with Cascade for 4,602 lineal feet of sound absorbing barriers, called "Whisper Wall," for the SR 17 project. Clerk's Papers (CP) at 73. The contract required CWA to pay extra costs incurred by Cascade for any alteration or deviation to the walls. The contract required CWA to pay Cascade for completed work, subject to a finance charge:

2

> PAYMENT TERMS:
> CSNW/[Cascade] will invoice [CWA] for completed work/materials on the 25th day of each month. [CWA] will remit payment to CSNW/[Cascade] upon the 10th day of the following month. Full payment will be paid within thirty (30) days of completion of the retaining wall. Late payments bear a finance charge of one and one-half percent (1-1/2%) per month.

Ex. 13 at 2.

CWA repeatedly directed Cascade to deviate from its standard method for precasting the Whisper Wall. One directive prohibited the use of accelerators in the concurring curing process, a standard component of Cascade's method for constructing the Whisper Wall. Another directive required Cascade to refrain from lifting the panels from the molds until the concrete reached 70 percent of its breaking strength, rather than the standard 50 percent. These deviations extended the curing period from 1 day to 3, increasing the total casting time from approximately 30 days to 100 days.

On March 1, 2007, Cascade's president, Rick Peterson, informed CWA's president of operations, Pamp Maiers, Jr., that the changes would result in additional costs for which CWA would be responsible.

> [Cascade] has redesigned the Whisper Wall™ system as requested, incurring considerable cost in doing so.
>
> . . . .
>
> If we are required to cast without an accelerator and achieve 70% strength prior to removing the panels from the forms it would greatly increase the Whisper Wall™ panel casting time, and add unnecessary cost to the project.

Ex. 52 at 1-2. The requests for alterations and deviations extended to the issue of edge picking.[1] On October 3, 2007, Cascade formally contested CWA's rejection of its edge pick submittal. Mr. Peterson wrote to CWA:

> The added work and new conditions rendered the original schedule useless together with making it impossible to complete the project at our agreed purchase order price.
>
> . . . .
>
> This has substantially increased our manufacturing cost and delayed our production. A preliminary completion of added cost to meet the requirements is outlined in Appendix "A". *These costs should not be considered final as the work and added costs are ongoing*.

Ex. 103 at 1 (emphasis added).

On January 30, 2008, Cascade sued CWA for breach of contract, damages under the Uniform Commercial Code, quantum meruit, and cardinal change. CWA filed counterclaims irrelevant to this appeal.

While construction on the project and litigation continued, on February 20, 2008, Cascade submitted a 78-page document to CWA. The first pages of the document are titled "INITIAL BID" and state "BID PRICE $1,209,432.44." Ex. 145 at 1-2. The next four pages are titled "OVERRUNS" and state "BID PRICE $1,365,052.23." Ex. 145 at 3-6. The remaining 72 pages contain hundreds of entries consisting of names of individuals and businesses, each with a corresponding dollar amount. Following project

---

[1] Edge picking refers to potential damage to the edges of precast elements during removal from molds or while being handled and stored.

4

completion, Mr. Peterson prepared a comprehensive billing statement for the additional costs. However, the record contains no evidence that this final bill was ever submitted to CWA. Cascade's accountant, Dale Huffman, later conducted an audit and determined the actual cost overrun to be $902,275.86. CWA refused to pay the amount.

Cascade first asserted that the extra costs associated with CWA's requested alterations and deviations to the walls amounted to $1,365,052.23, as listed in exhibit 145. Cascade's president testified about the genesis of exhibit 145:

> [DEFENSE]: Now, taking a look at the first six pages of Exhibit 145, I guess my—my main two questions are who drafted it and what's—what's its purpose?
>
> . . . .
>
> [PETERSON]: You know, I'm not sure who drafted it. I certainly didn't do all this typing because I'm not a typist person, but I did have input into it. And it was an estimate—a guesstimate.
>
> . . . .
>
> [DEFENSE]: Page 6 of [Exhibit] 145. It says 1,000,000—it's highlighted, but it says $1—
>
> [PETERSON]: Right.
>
> [DEFENSE]: —365,052.23. What does that number represent to you?
>
> [PETERSON]: I can't read it on my copy.
>
> [DEFENSE]: Okay. I'll represent to you that his shaded-in number is $1,365,052.23.
>
> [PETERSON]: Yes.

> [DEFENSE]: What does that number represent to you?
>
> [PETERSON]: I think that was the cost overrun number. That's what it represents. This was preliminary to the final cost occurring that the auditor, CPA, accountant did when we filed the claim.

Rep. of Proc. (RP) (July 12, 2023) at 131-32.

The jury ultimately found CWA had breached the contract and awarded Cascade $625,968.00 in damages. Thereafter, Cascade successfully moved the trial court for an award of attorney fees and costs. It also moved for postjudgment interest and prejudgment interest under two theories. First, Cascade argued the jury's award should be treated as a finding that CWA was delinquent in making a payment under the terms of the contract, entitling it to interest at 18 percent per annum. Secondly, Cascade argued it was entitled to prejudgment interest because the claim was liquidated.

The trial court denied Cascade's request for prejudgment interest under the contract, ruling:

> Cascade relies on Exhibit 145 to support its claim that it complied with the terms of the parties' agreement and sent CWA an "invoice" by the 25th of the month. However, the Court concurs with CWA with respect to Exhibit 145. To wit, Exhibit 145 was not an invoice, and under the terms of the party's agreement, Cascade was required to send an invoice to CWA. The sending of an invoice was a necessary predicate before a payment, or lack thereof, could be characterized as being delinquent (and thus triggering a financing charge of 18% per annum). Exhibit 145 was a summary of cost overruns with overhead and profit set forth therein, not an invoice. The Court would also note that the summary contained in Exhibit 145 was characterized at trial as nothing more than an "estimate," a "guesstimate," and "preliminary."

CP at 586-87. In ruling on a later motion for reconsideration, the court further clarified:

> Cascade's delivery of Exhibit 145 to CWA did not trigger CWA's
> obligation to pay for additional work because the sum it named was a
> preliminary estimate which anticipated revision at a later date by Cascade's
> auditors or CPAs to produce a more exact and certain figure.

CP at 630. The court also denied Cascade's request for prejudgment interest on its

purported liquidated sum:

> Cascade asked the jury to return a verdict of $902,052.23. The jury
> returned a verdict of $625,968.00 . . . . It is impossible to know, absent
> juror affidavits, whether the jury landed on $625,968.00 by compromise, by
> using its own calculations, by deleting items, or by relying on a more
> subjective method. What is clear and undisputed is this—the jury did not
> accept Cascade's figure. It cannot be said that the jury did not exercise any
> opinion or discretion in reaching its award . . . . The Court also notes at
> least one of Cascade's witnesses testified that Cascade's March 20, 2008
> "summary" was a "guesstimate," which further supports the conclusion that
> Cascade's claim was unliquidated.

CP at 586. The court awarded Cascade postjudgment interest at the statutory rate of 12

percent. This appeal follows.

## ANALYSIS

### PREJUDGMENT INTEREST UNDER THE CONTRACT

Cascade argues the court erred in denying prejudgment interest pursuant to the

terms of the contract. In response, CWA claims the interest provision was not triggered

because CWA was never invoiced for the extra costs. We agree with CWA.

As an initial matter, Cascade claims the issue before this court is the interpretation

of the interest provision in the contract, subject to de novo review. CWA agrees with this

7

standard of review. While we agree the issue of contract interpretation is subject to de novo review, here, the trial court made a factual finding that exhibit 145, the document Cascade claimed was an invoice, was not an invoice for purposes of the contract. Cascade fails to assign error to this finding. Instead, Cascade asserts in its assignments of error that "[t]he trial judge erred in refusing to grant [Cascade Concrete] contract interest at the rate of 18% per annum as provided in the contract." Op. Br. of Appellant at 2.

It is well established that unchallenged findings of fact will be accepted as verities on appeal. *State v. Eyman*, 24 Wn. App. 2d 795, 818, 521 P.3d 265 (2022). "We will review only those [findings of] fact to which error has been assigned." *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). Any challenged findings will be affirmed on appeal if supported by substantial evidence in the record. *Id*. at 644. Although Cascade failed to assign error to the trial court's finding that exhibit 145 was not an invoice, we nevertheless exercise our discretion, address the issue, and affirm.

Here, the contract undisputably entitles Cascade to interest on delinquent balances. However, the interest provision is only triggered after Cascade invoices CWA and CWA fails to timely remit payment. Thus, application of the contract's 18 percent interest rate hinges on the definition of "invoice."

The primary objective of contract interpretation is to ascertain the mutual intent of the parties when they executed the contract. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Washington follows the "objective

manifestation theory" of contract interpretation that focuses on the reasonable meaning of the contract language to determine the parties' intent. *Heart Commc'ns, Inc. v. Seattle Times, Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* at 504. We review the contract as a whole, interpreting particular language in the context of other contract provisions. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014). A dictionary may be used to ascertain the ordinary meaning of the undefined term. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990).

Under the unambiguous language of the contract, Cascade is entitled to interest if it issues an "invoice" by the 25th of a month and CWA fails to pay the invoice by the 10th of the following month. Although "invoice" is not defined in the contract, the dictionary definition of "invoice" is "to submit a statement of charges for : BILL." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1190-91 (1993). The trial court employed a similar definition in determining that exhibit 145 was not an invoice, stating, "Cascade's dictionary definition of 'invoice' [is] a document that 'shows what you must pay.'" CP at 630. The trial court's definition of "invoice" was not erroneous.

The real dispute here is whether exhibit 145 qualified as an invoice as that term was legally defined. This is a question of fact. Cascade did not assign error to the trial court's finding that exhibit 145 was an invoice, rendering it a verity on appeal. *State v.*

9

*Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Notwithstanding Cascade's failure to challenge the finding, we conclude that substantial evidence supports the finding that exhibit 145 was not an invoice.

We review a trial court's factual findings for abuse of discretion. *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997). A trial court abuses its discretion when the record does not support the court's findings. *In re Marriage of Kim*, 179 Wn. App. 232, 240, 317 P.3d 555 (2014). When reviewing a trial court's ruling, this court determines whether the trial court's findings are supported by substantial evidence and whether the findings support the conclusions of law. *Real Carriage Door Co. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). Substantial evidence exists if it is sufficient to persuade a rational, fair-minded person that the finding is true. *Viking Bank*, 183 Wn. App. at 712. We review the evidence, including all reasonable inferences, in the light most favorable to the prevailing party. *Real Carriage Door Co.*, 17 Wn. App. 2d at 457. We will not reweigh credibility on appeal. *Garza v. Perry*, 25 Wn. App. 2d 433, 453, 523 P.3d 822 (2023).

In finding exhibit 145 did not meet the definition of "invoice," the trial court primarily relied on Cascade's own witnesses and the exhibit itself. Cascade's president, Mr. Peterson, testified that the purpose of exhibit 145 "was an estimate—a guesstimate" and the "shaded-in number [of] $1,365,052.23" in the document "was preliminary to the final cost occurring that the auditor, CPA, accountant did when we filed the claim." RP

10

(July 12, 2023) at 131-32.  Indeed, Cascade's accountant later conducted an audit and determined the actual cost overrun to be $902,275.86, an approximate one-third reduction from the "BID PRICE $1,365,052.23."  Exs. 145, 155.  The record supports Mr. Peterson's unrebutted testimony that exhibit 145 was merely a "guesstimate."  RP (July 12, 2023) at 131.  Further, the jury ultimately returned a verdict of $625,968.00 in actual damages, less than one-half of the "BID PRICE" and approximately one-third less than Cascade's demand at trial.

Substantial evidence supports the trial court's finding that Cascade's admitted "guesstimate," "estimate," and "preliminary" amount in extra costs does not amount to a statement of charges for which CWA would be responsible for payment.  RP (July 12, 2023) at 132.  In viewing the evidence in the light most favorable to the CWA, the trial court's finding that exhibit 145 is not an invoice is supported by substantial evidence.  Because the court's finding that no invoice was issued is supported by substantial evidence, as a matter of law, Cascade was not entitled to prejudgment interest under the terms of the contract.

PREJUDGMENT INTEREST ON PURPORTED LIQUIDATED SUM

Separate from its contractual claim for interest on overdue invoices, Cascade contends the trial court erred in denying it prejudgment interest on its purported liquidated claim.  Because Cascade's claim was unliquidated, we disagree.

11

As a preliminary matter, Cascade again asserts the issue before this court is one of contract interpretation subject to de novo review. Relying on *Humphrey Industries, Limited v. Clay Street Associates, LLC*, 176 Wn.2d 662, 295 P.3d 231 (2013), CWA responds that a trial court's ruling on prejudgment interest is reviewed for an abuse of discretion. We agree with CWA and review the trial court's order on prejudgment interest for abuse of discretion. *Id*. at 672.

Prejudgment interest is awardable:

> (1) when an amount claimed is 'liquidated' or (2) when the amount of an 'unliquidated' claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

*Kiewit-Grice v. State*, 77 Wn. App. 867, 872, 895 P.2d 6 (1995) (quoting *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 614, 821 P.2d 63 (1991)). "A claim is liquidated if 'the evidence furnishes data which, if believed, makes it possible to compute the amount [owed] with exactness, without reliance on opinion or discretion.'" *Id*. (quoting *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968)). Conversely, a claim is unliquidated if the exact amount "'cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed.'" *Id*. (quoting *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986)).

12

Here, the trial court found Cascade's claim was unliquidated because the jury had to resort to opinion or discretion to calculate Cascade's damages. Substantial evidence supports the trial court's finding. Rather than furnishing CWA or the trier of fact with evidence of an exact amount owed by CWA or a fixed standard in the contract to compute the amount, Cascade presented an "estimate" or "guesstimate" that was preliminary and subject to change. At trial, Cascade deviated from its original "estimate," and sought approximately one-third less than the original amount. The jury awarded Cascade approximately one-third less than its demand at trial and about one-half of its original claim. Consequently, the jury had to rely on its discretion or opinion to decide Cascade's actual damages.

In viewing the evidence in the light most favorable to CWA, substantial evidence supports the trial court's finding, that Cascade was not entitled to prejudgment interest on its unliquidated sum, was determined through reliance on opinion or discretion. Because the court's finding that the claim was unliquidated is supported by substantial evidence, as a matter of law, Cascade was not entitled to prejudgment interest on its purported liquidated amount.

POSTJUDGMENT INTEREST AT CONTRACT RATE

Cascade argues the trial court erred in setting postjudgment interest at the statutory rate of 12 percent rather than the contract rate of 18 percent. We disagree.

13

We generally review a trial court's determination on postjudgment interest de

novo. *TJ Landco, LLC v. Harley C. Douglass Inc.*, 186 Wn. App. 249, 256, 346 P.3d 777

(2015). Notwithstanding, here, the question is not whether Cascade is entitled to

postjudgment interest. Rather, the dispute centers on whether Cascade is entitled to the

contractual interest rate or the statutory interest rate. Because the trial court relied on its

opinion and discretion in finding the contractual interest rate was not triggered, we

review the trial court's finding for substantial evidence.

RCW 4.56.110 provides:

Interest on judgments shall accrue as follows:

> (1) Judgments founded on written contracts, providing for the payment
> of interest until paid at a specified rate, shall bear interest at the rate
> specified in the contracts:

. . . .

> (6) Except as provided under subsections (1) through (5) of this section,
> judgments shall bear interest from the date of entry at the maximum rate
> permitted under RCW 19.52.020 on the date of entry thereof. . . .

RCW 19.52.020(1)(a) sets the interest rate at 12 percent unless otherwise agreed to in

writing.

Cascade's entitlement to postjudgment interest at the contractual rate of 18 percent

hinges on whether exhibit 145 was an "invoice" for purposes of triggering the finance

changes. As discussed above, substantial evidence supports the trial court's finding that

exhibit 145 was not an invoice; therefore, the contractual interest rate of 18 percent did

14

not become operational. Consequently, the trial court properly applied the statutory postjudgment interest rate of 12 percent.

ATTORNEY FEES ON APPEAL

Both parties request their attorney fees under RAP 18.1 and the contract's attorney fee provision. Because Cascade has not prevailed in this appeal, it is not entitled to attorney fees. However, CWA, as the prevailing party, is entitled to attorney fees under the contract.

RAP 18.1(a) allows a party to request attorney fees and costs if applicable law grants to a party the right to recover reasonable attorney fees or expenses on review. A contract that allows for the award of attorney fees supports an award of attorney fees on appeal. *Umpqua Bank v. Shasta Apartments, LLC*, 194 Wn. App. 685, 699-700, 378 P.3d 585 (2016). A contract that contains an attorney fee provision for one party authorizes the award to the prevailing party. RCW 4.84.330.

Here, the contract provides: "In the event of legal action, which specifically includes arbitration or mediation, must be instituted to enforce payment, [CWA] agrees to pay CSNW/[Cascade] for all attorney fees and costs." Ex. 13 at 3. The present lawsuit and this appeal both directly concern the contract and enforcement of payment. Thus, because CWA prevailed on appeal, we grant CWA its reasonable attorney fees and costs on appeal.

No. 40429-3-III
*Cascade Concrete v. Central Washington Asphalt*


Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Cooney, J.

I CONCUR:

Staab, A.C.J.

No. 40429-3-III

FEARING, J — (dissent) A jury awarded Cascade Concrete Industries, Inc. (CCI) $625,968 against Central Washington Asphalt, Inc. (CWA), who hired CCI to install sound barriers along a highway. The award represented extra costs incurred by CCI because of changed specifications under the parties' subcontract. This appeal obliges the court to decide whether CCI should receive pre-judgment interest and post-judgment interest under the contract at the rate of 18 percent per annum. The superior court denied CCI any pre-judgment interest and allowed it only 12 percent post-judgment interest. The resolution of the appeal entails a reading of the parties' subcontract more than an analysis of the nature of interest.

The superior court ruled that CCI needed to have sent CWA an invoice in order to be entitled to any pre-judgment interest. The court further declared that CCI sent no invoice. Based on a reading of the parties' construction subcontract, I conclude that CCI possessed no duty to tender an invoice in order to qualify for pre-judgment interest on costs incurred because of changes to the work. I further conclude that, assuming the requirement of an invoice, CCI sent one to CWA in February 2008. Unlike the majority, I would reverse the superior court and grant CCI pre-judgment interest and post-judgment interest at 18 percent.

Under the majority's ruling, CWA used CCI's $625,698 for fifteen years for free. During these fifteen years, the $625,698 decreased in value by 45 percent.

------------------------

The majority excises some important facts in their opinion. I add those facts to my dissenting opinion. To enable this dissent to flow for the reader, I combine the additional facts with some of the facts narrated in the majority opinion. I take the facts from the exhibits introduced and the testimony presented at trial.

CWA as its name suggests is an asphalt contractor with its home office in Moses Lake and local offices throughout central Washington. CWA specializes in major highway and other public road construction projects.

CCI, in addition to pouring concrete and selling precast concrete products, is a dealer and installer of the trademarked product, Whisper Wall™. A Whisper Wall™ consists of stretch-fabric acoustical panels that significantly reduce traffic noise, effectively blocking sound from highways to nearby neighborhoods. The contractor typically precasts the walls off-site.

CWA entered a contract with the Washington State Department of Transportation (WSDOT) for a road construction project on State Route 17 (SR 17) near Moses Lake. In turn, on August 2, 2006, CWA subcontracted with CCI to supply 4,602 lineal feet of 14-foot-high Whisper Wall™ for SR 17.

I quote critical passages in the parties' subcontract:

> This quotation is based on a quantity of 4,602 linear feet / 64,400
> square feet of the Proprietary Whisper Wall™ sound absorbing wall system.

2

The quote is for materials only at a unit price of $18.78 psf. This quantity is an approximation based on civil drawings dated 6/21/06 State of Washington job # 06B018 and the actual quantities installed will be the measurement for payment. Ex. P13

. . . .

Item # 1: Whisper Wall™ System

CSNW/CCI will Supply the Whisper Wall™ System materials only with above inclusions / exclusions for a total of $1,209,432.00 ($18.78 / sf) plus all sales or other taxes imposed by state or regulatory agencies, which may apply. This proposal is valid for a period of 30 days commencing August 02, 2006.

METHOD OF MEASUREMENT AND PAYMENT:

Payment is based on a contract for construction of the retaining walls as described in contract bid documents. Changes or alterations will adjust the price as below.

CHANGES:

*Any alteration or deviation from the wall(s) items described in the specifications above involving extra cost of materials, equipment, or labor will be presented to the Owner/General Contractor and will become an extra charge over the sum mentioned in this proposal and be paid to Concrete Systems Northwest, Inc, within the pay period such services are provided.* Extra charges for additional wall are provided at the contract rate above.

. . . .

PAYMENT TERMS:

CSNW/*CCI will invoice* Owner/Contractor for completed work/materials on the 25th day of each month. Owner/Contractor will remit payment to CSNW/CCI upon the 10th day of the following month. *Full payment will be paid within thirty (30) days of completion of the retaining wall. Late payments bear a finance charge of one and one-half percent (1 1/2 percent) per month.*

CLAIMS/DISPUTES

In the event legal action, which specifically includes arbitration or mediation, must be instituted to enforce payment, General Contractor agrees to

3

pay CSNW/CCI for all attorney fees and costs (which specifically include expert fees).

Ex. 13 (emphasis added).

During the course of the SR 17 project, CWA repeatedly directed CCI to deviate from its standard method for precasting the Whisper Wall™. WSDOT initiated the directives. One directive prohibited the use of accelerators, a standard component of CCI's curing of the Whisper Wall™. Another directive required that CCI refrain from lifting the panels from their molds until the concrete reached 70 percent of its breaking strength rather than the standard 50 percent. This change extended the curing period from 1 to 3 days, increasing the total casting time from 30 days to 100 days. During this lawsuit, CWA denied that any of its directives to CCI changed the specifications for the project.

On October 3, 2007, CCI owner Rick Peterson wrote CWA President Pamp Maiers that the change directives would cause CCI additional costs for which CWA would be responsible.

> CCI has redesigned the Whisper Wall™ system as requested, incurring considerable cost in doing so . . . The field inspector assigned to the pilaster production . . . has made numerous "on the spot" changes. The first 57 units cast were verbally approved; however, the field inspector is waiting for formal WSDOT approval before he stamps any more units. Meanwhile, pilasters continue to be produced; 90 plus pilasters are now collecting dust at the H2 plant; note: only seven have been shipped to the job site as of this date.

4

> We request the use of this accelerator specifically to achieve a panel production schedule that will best suit CWA's pilaster installation schedule (and also allows CCI to comply with the CWA purchase order). If we are required to cast without an accelerator and achieve 70 percent strength prior to removing the panels from the forms it would greatly increase the Wisper Wall™ panel casting time, and add unnecessary cost to the project.

Ex. 52.

CWA also directed deviations from CCI's standard procedures of edge picking. In precast concrete construction, edge picking refers to potential damage to the edges of precast elements during removal from molds or while being handled and stored. On October 3, 2007, CCI formally contested CWA's most recent rejection of its edge pick submittal, asserting that the rejection demonstrated a pattern of inconsistent and overly burdensome oversight by WSDOT. The contest read:

> The added work and new conditions rendered the original schedule useless together with making it impossible to complete the project at our agreed purchase order price . . . Through you we have continually received one WSDOT redesign of our proprietary "Whisper Wall™" system after another. This has substantially increased our manufacturing cost and delayed our production. A preliminary completion of added cost to meet the requirements is outlined in Appendix "A". *These costs should not be considered final as the work and added costs are ongoing*.

Ex. 103 at 1 (emphasis added).

Appendix A to the October 3 letter listed additional costs to date of $73,600 in pilaster cost; $58,850 additional crane cost; $11,500 cage construction; $57,960 additional man hours; $42,296 form modification; $3,061 per Whisper Wall™ panel;

5

$29,920 structural mix; $7,216 back stamp panel change; an unknown amount for lifting device engineering; $3,777 survey error; $4,256 access door changes; and $2,950 additional small panels. Rick Peterson estimated that changes imposed on CCI by WSDOT had reached $599,952. Costs were ongoing.

In addition to the October 2007 letter, CCI owner Rick Peterson, at an unknown date and perhaps on more than one occasion, spoke with CWA President Pamp Maiers about the increased costs and told him CCI expected CWA to pay the increased costs necessitated by the changes. Maiers instructed Petersen to follow WSDOT procedures when claiming extra costs.

In a November 26, 2007, letter, WSDOT informed CWA of substantial completion of the SR 17 project. WSDOT qualified the notice with: "This does not constitute physical completion, completion or acceptance of the contract." Ex. 132.

In February 2008, CCI prepared an itemized list for CWA of increased costs incurred to date, totaling $1,365,052.23. I will refer to the submittal as "the February itemization." The parties wrangle over whether the February itemization constitutes an "invoice." Pamp Maiers, CWA President, received the itemization in March 2008. Report of Proceedings (RP) at 621-22.

The title to the first two pages of the seventy-eight-page February itemization is "INITIAL BID." The title to the next four pages is "OVERRUNS." The first two pages

6

list the bid price as $1,209,432.44, while the next four pages identify the bid price as

$1,365,052.23. The first two pages appear to be entries for how CCI calculated the initial

contract price. The next four pages appear to be entries for calculating additional costs

incurred because of changes using the unit prices in the initial bid. Categories of

additional costs include labor, overtime, materials, bridge standards, compressional

strength, accelerator delay, pilaster rejection, WSDOT inspectors, WSDOT approval

delays, patching, lost cage, panel changes, casting days and delays, casting tables, rentals,

taxes, markups. The remaining seventy-two pages of the February itemization comprise

hundreds of entries that list a date, a vendor or contractor, and a cost. The costs total

$1,365,052.23.

During trial, CCI President Rick Peterson testified that he assisted in preparing the

February itemization. He described the itemization as a "guesstimate." RP at 131-32.

According to Peterson, CCI attempted to unscientifically allocate its costs to different

parts of the job. CCI could not precisely allocate an employee's time between the various

causes creating cost overruns. The $1,365,052.23 amount represented "the cost overrun

number" "preliminary to the final cost" that the accountant would later calculate. RP at

132. The $1,365,052.23 included overhead and profit.

During trial, CWA President Pamp Maiers admitted that the February itemization

constituted a detailed cost breakdown of the extra costs incurred by CCI. When CWA

received the itemization, Maiers reviewed it and could readily determine the amount of the extra charges being claimed by CCI. CWA never challenged the reasonableness of the costs listed in the February itemization. CWA did not then demand that CCI provide any further documentation or insist that the list did not qualify as an invoice. It did not pay any of the amount, however. Rick Peterson testified that CCI incurred borrowing costs to pay the debts incurred because of the change in specifications.

Throughout CCI's performance of the contract, CWA paid invoices submitted by CCI. At least one of these invoices contained less information than that found in the February itemization. CWA paid $62,500 to North Central Construction, another subcontractor, based on a single line in a letter.

-------------------

On January 30, 2008, even before CCI prepared and sent the February itemization, CCI sued CWA seeking compensation for additional work performed on the project. CCI asserted four theories of recovery: (1) breach of contract, (2) breach of the Uniform Commercial Code, (3) quantum merit, and (4) cardinal change. CWA defended CCI's claim by arguing that the specifications for the construction subcontract required CCI to perform the work it contended constituted changes. CWA filed a counterclaim claiming that CCI caused delays that increased the cost of performance for CWA.

8

In May 2010, CCI brought a summary judgment motion to dismiss CWA's affirmative defenses. In its pleadings, CCI claimed that CWA owed $998,317.34, not $1,365,052.23, for costs resulting from changed specifications.

In 2016, CCI tasked its accountant Dale Huffman to verify the accuracy of all receipts and costs associated with the Whisper Wall™ SR 17 project. At trial, Huffman testified that he conducted an audit and determined the cost overrun to be $921,756.29. Huffman reviewed every paid invoice and payroll record for the project. CWA again refused to pay any amount.

Before trial, Dale Huffman revised his number of unpaid costs to $902,275.86. CCI asked for this amount at trial.

At the conclusion of trial, CCI requested that the jury decide whether to grant CCI pre-judgment interest. CCI proposed a jury instruction on the subject matter. The superior court engaged in a discussion with both counsel:

> MR. MOBERG: [Attorney for CCI] . . . [Jury instruction] twenty-two is the interest instruction . . .
>
> MR. GARVIN: [Attorney for CWA] I do have a problem, issue with that, your Honor, because that's really a post-trial motion on interest on a contract. The jury doesn't need to decide that.
>
> MR. MOBERG: Well, I think the jury can. I mean the cases I've cited, the jury awarded interest on the contract and it's provided in the contract. What the cases say is we don't want them to compound the interest. And so we have to tell the jury that if you're going to award interest, it's simple interest. Because the jury has to decide when — when the amount was presented and then what duration of time the interest has accrued.

9

> THE COURT: I agree with Mr. Garvin. We'll take care of this, if it comes to that, after trial.

> MR. MOBERG: All right. So let me clarify that, then. You want to tell this jury that they only award the amount of damages and then you'll determine application of interest?

> THE COURT: I'm not going to tell them anything. If they award damages, I'll determine whether interest should be applied.

RP at 191.

On August 2, 2023, the jury found CWA obligated CCI to perform work beyond that demanded in the construction subcontract and awarded Cascade $625,968 in damages. After the jury award, CCI requested the superior court to award it pre-judgment interest and post-judgment interest both at 18 percent per annum. CCI argued entitlement to the interest under the contract and as a liquidated claim.

The trial court denied CCI's request for pre-judgment interest. The superior court ruled:

> Cascade relies on Exhibit 145 [the February list] to support its claim that it complied with the terms of the parties' agreement and sent CWA an "invoice" by the 25th of the month. However, the Court concurs with CWA with respect to Exhibit 145. To wit, Exhibit 145 was not an invoice, and under the terms of the party's agreement, Cascade was required to send an invoice to CWA. The sending of an invoice was a necessary predicate before a payment, or lack thereof, could be characterized as being delinquent (and thus triggering a financing charge of 18 percent per annum). Exhibit 145 was a summary of cost overruns with overhead and profit set forth therein, not an invoice. The Court would also note that the summary contained in Exhibit 145 was characterized at trial as nothing more than an "estimate," a "guesstimate," and "preliminary."

No. 40429-3-III
*Cascade Concrete Industries Inc. v. Central Washington Asphalt* (dissent)

Clerk's Paper's (CP) at 586-87. In ruling on a later motion for reconsideration, the court added:

> Cascade's delivery of Exhibit 145 to CWA did not trigger CWA's obligation to pay for additional work because the sum it named was a preliminary estimate which anticipated revision at a later date by Cascade's auditors or CPAs to produce a more exact and certain figure.

CP at 630.

------------------------------

CCI's appeal raises two principal questions. First, is CCI entitled to pre-judgment interest on the $625,968 jury award? This first issue raises many subquestions. To be entitled to interest under the parties' construction subcontract, must CCI have sent CWA an invoice? What constitutes an invoice? Did CCI send CWA an invoice? Was CCI's claim against CWA a liquidated claim for purposes of pre-judgment interest?

CWA agrees CCI is entitled to post-judgment interest. The second principal question is whether post-judgment interest accrues at the contract rate of 18 percent or the statutory rate of 12 percent.

I conclude that CCI need not have delivered an invoice to CWA to collect pre-judgment interest. I determine, however, for good measure, that CWA sent an invoice. Because I conclude that the contract afforded CCI pre-judgment interest at the rate of 18 percent per annum, I do not address whether CCI's claim against CWA is a liquidated claim.

11

------------------------------

CCI seeks 18 percent pre-judgment interest on the $625,968 jury award based on its contract with CWA. If a contract demands payment of interest as part of the debt due, the creditor may recover interest as a matter of right. *Farm Credit Bank of Spokane v. Tucker*, 62 Wn. App. 196, 201, 813 P.2d 619 (1991). The parties may contractually agree to a rate of interest higher than the statutory rate. RCW 4.56.110; RCW 19.52.020; *DeBoer v. Attebury Grain, LLC*, 684 S.W.3d 520, 529 (Tex. App. 2024). RCW 4.56.110 and RCW 19.52.020 require the court to impose the contract rate of interest.

Resolution of the question concerning the need for an invoice calls for a comprehensive and meticulous reading of the parties' August 2, 2006, construction subcontract. Courts apply the same rules of construction applicable to contracts generally when interpreting agreements for the payment of interest. *Ex parte Aurora Federal Sav. and Loan Association*, 223 Md. 135, 140, 162 A.2d 739 (1960). Courts view a contract as a whole, interpreting particular language in the context of other contract provisions. *Raab v. Nu Skin Enterprises, Inc.*, 28 Wn. App. 2d 365, 389, 536 P.3d 695 (2023), *aff'd*, 4 Wn.3d 464, 565 P.3d 895 (2025). We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement demonstrates a contrary intent. *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005). The court may ascertain the meaning of a word by reference to a standard

No. 40429-3-III
*Cascade Concrete Industries Inc. v. Central Washington Asphalt* (dissent)

English dictionary. *Queen City Farms, Inc. v. Central National Insurance Co.*, 126

Wn.2d 50, 77, 882 P.2d 703 (1994).

CWA argues that, under the terms of the construction subcontract, particularly the

"Payment Terms" section, CCI must have tendered an invoice to warrant recovery of pre-

judgment interest. CWA then contends CCI never sent it an invoice. CCI maintains that

two provisions in the construction subcontract read that it need not have delivered CWA

an invoice to be awarded pre-judgment interest. First, the lead sentence in the Changes

section declares that extras costs caused by deviations from the specifications "will be

presented" by CCI to CWA and paid by CWA. Second, the third sentence in the

"Payment Terms" section dictates that CWA tender full payment, within 30 days of

completion of the retaining wall, without the mention of the need for an invoice. I agree

with CCI.

> CSNW/*CCI will invoice* Owner/Contractor for completed
> work/materials on the 25th day of each month. Owner/Contractor will remit
> payment to CSNW/CCI upon the 10th day of the following month. *Full
> payment will be paid within thirty (30) days of completion of the retaining wall.
> Late payments bear a finance charge of one and one-half percent (1 1/2
> percent) per month.*

CP at 530.

CWA emphasizes the language in the first sentence that requires the supply of an

invoice each month. CWA incorporates this language into the remaining sentences of the

13

subcontract section when insisting that it need not pay the following month without an invoice. In turn, any debt does not accrue the finance charge without previously being invoiced. CWA underscores that it could not know what amount to pay without an invoice.

CWA's reading of the "Payment Terms" might prevail to the extent that CCI sought payment based on the monthly invoices for the work originally contemplated under the construction subcontract. CWA must pay by the 10th day of the following month assuming CCI provides an invoice on the 25th of the month. Nevertheless, CCI's judgment is not based on any monthly invoice. CCI seeks payment because of extra work caused by extra demands on it.

CCI seeks payment under the "Changes" paragraph of the subcontract. I repeat the first sentence of the "Changes" section of the contract:

> Any alteration or deviation from the wall(s) items described in the specifications above involving extra cost of materials, equipment, or labor *will be presented* to the Owner/General Contractor and will become an extra charge over the sum mentioned in this proposal and be paid to Concrete Systems Northwest, Inc, within the pay period such services are provided.

CP at 530 (emphasis added). The paragraph on changes does not mention the need for CCI to remit an invoice. The paragraph merely requires that CCI "present" the "extra cost" to CWA. The verb "present" elicits numerous definitions including "give," "bring," "introduce into the presence of someone," "offer," "show," "to bring to one's attention."

14

No. 40429-3-III
*Cascade Concrete Industries Inc. v. Central Washington Asphalt* (dissent)

MERRIAM-WEBSTER ONLINE DICTIONARY, *https://www.merriam-webster.com/dictionary/present* (last visited December 9, 2025). The parties could have required the sending of an invoice for the changes. The failure to do so and use of the alternate word "present" must mean that CCI needed to provide CWA something less than an invoice for CWA to become obligated to pay the change costs.

On October 3, 2007, CCI formally presented the extra costs incurred to CWA. Appendix A to the October 3 letter itemized the costs and totaled the costs at $599,952. CCI warned CWA that the former's costs would continue to increase. CWA does not argue that the October 3 letter failed to "present" extra costs within the meaning of the parties' construction subcontract.

CWA also does not contend that the February itemization received in March 2008 did not present extra costs incurred by CCI. The February itemization included 71 pages comprising hundreds of entries that record a date, a vendor or contractor, and a cost. Initial pages itemized the costs into categories. The costs totaled $1,365,052.23.

The last two sentences in the "Payment Terms" paragraph of the subcontract control the question of pre-judgment interest. CWA became obligated to pay CCI all amounts owed 30 days after completion of the retaining wall. WSDOT declared the project substantially complete on November 21, 2007. CWA presents no testimony that CCI performed work thereafter. Therefore, CWA owed all remaining amounts to CCI on

15

December 21, 2007. CCI needed to send no invoice under these conditions. CCI probably did not even need to present extra costs as a condition to receiving pre-judgment interest because of the completion of the project.

The "Payment Terms" paragraph referenced CCI sending CWA monthly invoices, and the provision for pre-judgment interest lay in the same paragraph. Nevertheless, the construction subcontract nowhere read that the sending of an invoice constituted a condition precedent to payment of pre-judgment interest even on the monthly amounts owed. CWA could have insisted on such language. An act or event designated in a contract will not be construed as a condition unless that clearly appears to be the intention of the parties. *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Board*, 559 Pa. 56, 68, 739 A.2d 133 (1999).

The facts support interest commencing in October 2007, when CCI presented extra costs to CWA. Other facts support beginning accrual of interest on December 21, 2007, thirty days after completion of the SR 17 project. At the least, interest should begin in March 2008 after CWA received the extensive February itemization. I would remand to the superior court to determine at what date to commence the interest.

Under the jury's verdict, CWA owed CCI $625,968 at the latest in March 2008. From that date until payment of the judgment, CCI lost the use of the money and CWA retained use of the money. CWA could reap financial gain by investing the money.

16

Interest as interest compensates for the use or detention of money.  44B Am. Jur. 2d

*Interest and Usury* § 1 (2025).  Interest is not a penalty but compensation for the loss of

use of those funds.  *Jones v. Best*, 134 Wn.2d 232, 242, 950 P.2d 1 (1998).

-----------------------------

The majority writes that the superior court made a factual finding that the February

list was not an invoice for purpose of the "Payment Terms" paragraph in the construction

subcontract.  In turn, the majority faults CCI for failing to assign error to the factual

finding as required by RAP 10.3(g).  I presume the majority refers to the court's two

written rulings on the subject of pre-judgment interest when asserting that the trial court

entered a factual finding.  Nevertheless, the superior court did not, in either ruling,

suggest it intended to make any factual finding.  CWA does not ask that this court decline

to address CCI's insistence on having sent an invoice because of CCI's failure to assign

error to a factual finding.  The majority, ostensibly benevolently, reviews anyway CCI's

insistence that the February itemization fulfills the definition of an invoice.

Although the majority graciously waives the rule that this court will consider a

finding of fact a verity unless the appellant assigns error to the finding, the majority still

insists, without citing to the record, that the superior court entered a finding of fact that

the term "invoice," as used in the construction subcontract, did not include the February

itemization.  The majority indicates that substantial evidence supports the nonexistent

17

trial court finding.  Regardless of whether we review the superior court's denial of pre-judgment interest as a factual finding or a legal ruling, the definition of "invoice" contradicts the decision.  We interpret a contract as a matter of law and review the superior court's interpretation de novo.  *Dave Johnson Insurance, Inc. v. Wright*, 167 Wn. App. 758, 769, 275 P.3d 339 (2012); *Keystone Masonry, Inc. v. Garco Construction, Inc.*, 135 Wn. App. 927, 932, 147 P.3d 610 (2006).

The parties dispute the meaning of "invoice," while citing competing dictionary definitions, analogous statutes, administrative rules, and foreign case law.  The contract between CCI and CWA did not define the term "invoice."  Courts interpret undefined contractual terms according to their "plain, ordinary, and popular" meaning.  *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576, 964 P.2d 1173 (1998).  The court may discern this meaning by consulting standard English dictionaries.  *Queen City Farms, Inc. v. Central National Insurance Co.*, 126 Wn.2d 50, 77, 882 P.2d 703 (1994).  The *Oxford Learner's Dictionary* defines an invoice as "a list of goods that have been sold, work that has been done, etc., showing what you must pay."  OXFORD LEARNER'S DICTIONARIES, https://www.oxfordlearnersdictionaries.com/definition/english/invoice (last visited December 9, 2025).  The *Collins English Dictionary* defines it as "a lists of goods that have been supplied or services that have been done and says how much money you owe

18

No. 40429-3-III
*Cascade Concrete Industries Inc. v. Central Washington Asphalt* (dissent)

for them."  https://www.collinsdictionary.com/us/dictionary/english/invoice (last visited

December 9, 2025).  *Black's Law Dictionary* (12th ed. 2024) similarly defines invoice as:

> An itemized list of goods or services furnished by a seller to a buyer, usu.
> specifying the price and terms of sale; a bill of costs.

An invoice need not take any specific form as long as it states the product or

service provided and its price.  *DeBoer v. Attebury Grain, LLC*, 684 S.W.3d 520, 531

(Tex. App. 2024).  An invoice need not be signed.  *Smith's New & Used Cars, Inc. v.*

*Safeguard Insurance Co.*, 110 Ga. App. 385, 138 S.E.2d 683, 684 (1964).  An invoice is

nothing more than a list of goods sold with their price.  *Smith's New & Used Cars, Inc. v.*

*Safeguard Insurance Co.*, 110 Ga. App. 385, 138 S.E.2d 683, 684 (1964).

The February itemization meets all of the dictionary definitions of an invoice.  The

lengthy itemization catalogs the work performed, assigns a price to that work, and

provides detailed information on the completed tasks.

CWA emphasizes the February itemization as a guesstimate.  But, CWA cites no

law that an estimate or guesstimate cannot serve as an invoice.  CWA does not contend

that CCI prepared the February itemization in bad faith.  CCI prepared the itemization

with the best information it then possessed.  One case assumes the potential unreliability

of the information contained on the invoice.  *Anonymous v. Anonymous*, 150 A.D.3d 91,

94, 51 N.Y.S.3d 66 (N.Y. App. Div. 2017).  For example, for one reason or another, the

price of an item may be inflated or deflated or the description of the merchandise or

19

services rendered may be inaccurate or distorted. *Anonymous v. Anonymous*, 150 A.D.3d

91, 94 (N.Y. App. Div. 2017).

 *Bellon Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703 (Mo. Ct. App. 2002)

provides insight into the nature of an invoice. The trial court concluded that Bellon

Wrecking's December 21 letter to Rohlfing constituted an invoice for purposes of a

Missouri statute. The statute did not define the word "invoice," so the trial court relied

on the dictionary definition. On appeal, the reviewing court disagreed that the letter

qualified as an invoice. The court used the definition of an itemized list of goods or

services furnished by a seller to a buyer, specifying the price and terms of sale. The first

sentence of the December 21 letter read:

> This letter is sent to you in an attempt to settle the extra work I
> performed on the [demolition]. As I have discussed with you enclosed is a
> summary of the extra expense associated with removing the numerous
> concrete bases throughout the entire complex.

*Bellon Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703, 713-14 (Mo. Ct. App. 2002).

The attached summary only summarized the work performed but did not include

quantities or charges. The appellate court concluded that a question of fact existed as to

whether the letter constituted a settlement offer rather than an invoice.

 CCI accompanied the February itemization with seventy-one pages of transactions

descriptions, transaction dates, transaction references, and costs. Page six of the letter

lists the bid price as $1,365,052.23. In the context of the first two pages, which mentions

20

the initial bid price plus the unit prices that comprise the total bid of $1,209,432.44 and in light of the extra costs being based on the same unit prices, CWA could only conclude that the $1,365,052.23 bid price was an awkward way of indicating CCI demanded payment of this sum for the extra work. The February itemization contained no offer to compromise or settle, only an exhaustive inventory of amounts owed.

CCI suffered no harm from the February itemization not being a formal invoice or from its being an initial estimate. CWA did not know that the February itemization constituted a guesstimate. CWA never intended to pay any amount demanded by CCI. Instead, CWA insisted that CCI owed it money and forced CCI to go to trial to get even $1. If CWA possessed concern about paying pre-judgment interest, it could have tendered money into the court registry in order to stop the running of all or some of the interest.

CWA emphasizes that the jury awarded CCI an amount lower than found on the February itemization. The jury award exceeded, however, the October 2007 estimate sent to CWA. Regardless, an award of a lesser sum than presented in an invoice does not preclude the recovery of pre-judgment interest.

In *Scoccolo Construction, Inc. v. City of Renton*, 158 Wn.2d 506, 145 P.3d 371 (2006), a road contractor successfully sued the city for delays in completing a contract to widen a street. No contract awarded recovery of interest in the event the city did not

timely pay the contractor. The trial court awarded pre-judgment interest under the theory of liquidated damages. On appeal, the city asked for reversal of the award of pre-judgment interest. The city argued that the jury must have exercised discretion when awarding the contractor the amount of delay damages. The contractor asked for $935,433.27, and the city contended it owed $364,904. The jury granted $425,533. The Washington Supreme Court affirmed the award of pre-judgment interest. It noted that the city did not challenge the reasonableness of the expenses submitted by the contractor. The court followed the rule that a sum remains liquidated even though the adversary successfully challenges the amount and succeeds in reducing it.

*Scoccolo Construction v. City of Renton* is confusing, particularly since we do not know why the jury reduced the amount owed despite the city not challenging the reasonableness of the expenses. Regardless, in our case on appeal, CWA never challenged the reasonableness of the costs incurred by CCI. The jury ruled that CWA owed CCI $625,968 in March 2008. Although this amount is lower than sought by CCI, it is $625,968 more than CWA offered to pay. Although *Scoccolo Construction* dealt with liquidated damages rather than interest under a contract, the same principle should apply here. The contractor should not lose its right to pre-judgment interest because the judgment amount deceeds the invoiced amount.

The unreasonableness of CWA's position comes to light in a hypothetical. Imagine a $1 million contract between a builder and an owner of a building project allows for 15 percent interest on unpaid balances. The owner refuses to pay $900,000 of the amount, but the builder mistakenly writes in a bill that the owner owes $910,000. The builder sues for nonpayment and two years later receives a judgment for $900,000. Under CWA's argument, the builder could not collect pre-judgment interest during those two years because the amount of recovery fell below the invoice. This hypothetical poses an extreme case but illustrates the unfairness of CWA's position when CCI encountered extra work because of changed specifications.

------------------------

The trial court also erred when lowering post-judgment interest from 18 percent to 12 percent. When a case is based on contract, RCW 4.56.110 requires the court to impose the contract rate of interest on the judgment amount. *Xebek, Inc. v. Nickum & Spaulding Associates, Inc.*, 43 Wn. App. 740, 743, 718 P.2d 851 (1986). This reviewing court should also award CCI reasonable attorney fees and costs on appeal.

Fearing, J.